**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TROY MATTOS; JAYZEL MATTOS,
        *Plaintiffs-Appellees,*

    v.

DARREN AGARANO; RYAN AIKALA;
STUART KUNIOKA; HALAYUDHA
MACKNIGHT,
        *Defendants-Appellants,*

    and

MAUI COUNTY,
        *Defendant.*

No. 08-15567

D.C. No.
07-CV-00220-DAE

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

18999

MALAIKA BROOKS,
                    *Plaintiff-Appellee,*

                    v.

CITY OF SEATTLE,
                    *Defendant,*

              and

STEVEN L. DAMAN, in his capacity
as an officer of the Seattle Police
Department; DONALD M. JONES, in
his individual capacity as an
officer of the Seattle Police
Department; JUAN M. ORNELAS, in
his individual capacity as an
officer of the Seattle Police
Department,
            *Defendants-Appellants.*

No. 08-35526

D.C. No.
2:06-cv-01681-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
December 14, 2010—Pasadena, California

Filed October 17, 2011

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Barry G. Silverman, Susan P. Graber,
M. Margaret McKeown, Raymond C. Fisher,
Richard A. Paez, Johnnie B. Rawlinson, Richard R. Clifton,
and Carlos T. Bea, Circuit Judges.*

Opinion by Judge Paez;
Concurrence by Judge Schroeder;
Partial Concurrence and Partial Dissent by
Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Silverman

---

*Judge Pamela A. Rymer was drawn as a member of the en banc court for these cases. Following her recent death, we determined that it was not necessary to draw a replacement judge.

## COUNSEL

Brian T. Moto, Corporation Counsel, Laureen L. Martin, Moana M. Lutey, Richard B. Rost, and Cheryl Tipton, Deputies Corporation Counsel, Wailuku, Hawaii, for defendants-appellants Darren Agarano, Ryan Aikala, Stuart Kunioka, and Halayudha MacKnight.

Ted Buck and Karen L. Cobb, Stafford Frey Cooper, Seattle, Washington, for defendants-appellants Steven Daman, Juan Ornelas, and Donald Jones.

Eric A. Seitz, Honolulu, Hawaii, for plaintiffs-appellees Troy Mattos and Jayzel Mattos.

Eric Zubel, Eric Zubel PC, Seattle, Washington, for plaintiff-appellee Malaika R. Brooks.

John Burton, The Law Offices of John Burton, Pasadena, California, for the amicus curiae.

Daniel Marc Gluck, ACLU of Hawaii, Honolulu, Hawaii, for the amicus curiae.

Nancy Lynn Talner, ACLU of Washington Foundation, Joseph R. Shaeffer, MacDonald Hoague & Bayless, Seattle, Washington, for the amicus curiae.

## OPINION

PAEZ, Circuit Judge:

These cases present questions about whether the use of a taser to subdue a suspect resulted in the excessive use of force and whether the officers are entitled to qualified immunity.[1] In *Brooks v. City of Seattle*, Plaintiff Malaika Brooks was tased; in *Mattos v. Agarano*, Plaintiff Jayzel Mattos was tased. Both women were tased during an encounter with police officers. They subsequently filed suit under 42 U.S.C. § 1983 seeking damages for the alleged violation of their Fourth Amendment rights. In Brooks's case, the district court ruled that she alleged a violation of her Fourth Amendment right to be free from the excessive use of force when police officers tased her and that those police officers were not entitled to qualified immunity. In Jayzel and Troy Mattos's case, the district court ruled that questions of fact existed regarding whether the use of a taser against Jayzel was constitutionally reasonable and, therefore, denied the officers' motion for summary judgment on the basis of qualified immunity. Two different panels of our court reversed the district courts and held that the officers were entitled to qualified immunity. We granted en banc review. We now hold that, although Plaintiffs

---

[1]Our en banc court heard these cases together, and we have consolidated them for disposition.

in both cases have alleged constitutional violations, the officer Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claims because the law was not clearly established at the time of the incidents. We therefore reverse the district courts' denial of qualified immunity on these claims. In *Brooks*, however, we affirm the district court's denial of qualified immunity on her state law assault and battery claims against the defendant officers.

## I.   Brooks Background

On the morning of November 23, 2004, Plaintiff-Appellee Malaika Brooks was driving her 11-year-old son to school in Seattle, Washington. Brooks was 33 years old and seven months pregnant at the time. The street on which Brooks was driving had a 35-mile-per-hour posted speed limit until the school zone began, at which point the speed limit became 20 miles per hour. When Brooks entered the school zone, she was driving 32 miles per hour. Once in the school zone, a Seattle police officer parked on the street measured Brooks's speed with a radar gun, found that she was driving faster than 20 miles per hour, and motioned for her to pull over.

Once Brooks pulled over, Seattle Police Office Juan Ornelas approached her car. Ornelas asked Brooks how fast she was driving and then asked her for her driver's license. Brooks gave Ornelas her license and then told her son to get out of the car and walk to school, which was across the street from where Ornelas had pulled her car over. Ornelas left, returning five minutes later to give Brooks her driver's license back and inform her that he was going to cite her for a speeding violation. Brooks insisted that she had not been speeding and that she would not sign the citation. At this, Ornelas left again.

Soon after, Officer Donald Jones approached Brooks in her car and asked her if she was going to sign the speeding citation. Brooks again refused to sign the citation but said that she

would accept it without signing it. Jones told Brooks that signing the citation would not constitute an admission of guilt; her signature would simply confirm that she received the citation. Brooks told Jones that he was lying, the two exchanged heated words, and Jones said that if Brooks did not sign the citation he would call his sergeant and she would go to jail.

A few minutes later, Sergeant Steven Daman arrived at the scene and he, too, asked Brooks if she would sign the citation. When Brooks said no, Daman told Ornelas and Jones to "book her." Ornelas told Brooks to get out of the car, telling her that she was "going to jail" and failing to reply when Brooks asked why. Brooks refused to get out of the car. At this point, Jones pulled out a taser and asked Brooks if she knew what it was. Brooks indicated that she did not know what the taser was and told the officers, "I have to go to the bathroom, I am pregnant, I'm less than 60 days from having my baby." Jones then asked how pregnant Brooks was. Brooks's car was still running at this point.

After learning that Brooks was pregnant, Jones continued to display the taser and talked to Ornelas about how to proceed. One of them asked "well, where do you want to do it?" Brooks heard the other respond "well, don't do it in her stomach; do it in her thigh." During this interchange, Jones was standing next to Brooks's driver's side window, Ornelas was standing to Jones' left, and Daman was standing behind them both.

After Jones and Ornelas discussed where to tase Brooks, Ornelas opened the driver's side door and twisted Brooks's arm up behind her back. Brooks stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car. While Ornelas held her arm, Jones cycled his taser, showing Brooks what it did. At some point after Ornelas grabbed Brooks's arm but before Jones applied

the taser to Brooks, Ornelas was able to remove the keys from Brooks's car ignition; the keys dropped to the floor of the car.

Twenty-seven seconds after Jones cycled his taser, with Ornelas still holding her arm behind her back, Jones applied the taser to Brooks's left thigh in drive-stun mode. Brooks began to cry and started honking her car horn. Thirty-six seconds later, Jones applied the taser to Brooks's left arm. Six seconds later, Jones applied the taser to Brooks's neck as she continued to cry out and honk her car horn. After this third tase, Brooks fell over in her car and the officers dragged her out, laying her face down on the street and handcuffing her hands behind her back.

The officers took Brooks to the police precinct station where fire department paramedics examined her. The same day, Brooks was examined at the Harborview Medical Center by a doctor who confirmed her pregnancy and expressed some concern about Brooks's rapid heartbeat. After this examination, Brooks was taken to the King County Jail.

On December 6, 2004, the City of Seattle filed a misdemeanor criminal complaint against Brooks, charging her with refusal to sign an acknowledgment of a traffic citation, in violation of Seattle Municipal Code 11.59.090, and resisting arrest, in violation of Seattle Municipal Code 12A.16.050. Brooks was tried by a jury beginning on May 4, 2005, and after a two-day trial the jury convicted her of failing to sign the speeding ticket. The jury could not reach a verdict on the resisting arrest charge, and it was dismissed.

Brooks gave birth to her daughter in January 2005. The district court was presented with evidence that Brooks's daughter was born healthy, and Brooks's counsel confirmed at oral argument before this court that her daughter remains healthy now. Brooks herself has not experienced any lasting injuries from the tasing, though she does carry several permanent burn scars from the incident.

Brooks sued Ornelas, Jones, Daman, Seattle Police Department Chief Gil Kerlikowske, and the City of Seattle for excessive force in violation of the Fourth Amendment; Kerlikowske and the City of Seattle for negligence; and Ornelas, Jones, and Daman for assault and battery. The case is before us on interlocutory appeal from the district court's summary judgment ruling that the defendant officers Daman, Jones, and Ornelas are not entitled to qualified immunity. The district court denied the defendants' motion as to Brooks's § 1983 excessive force claim against the officers, concluding that with all the evidence construed in Brooks's favor, she alleged a Fourth Amendment excessive force claim and that the officers were not entitled to qualified immunity. The district court also denied the defendants' motion as to Brooks's state law assault and battery claims against the officers, concluding that these claims presented questions for a jury and that the officers were not entitled to state qualified immunity on these claims. The district court granted the defendants' summary judgment motion as to Brooks's § 1983 and negligence claims against Chief Kerlikowske and the City of Seattle. Thereafter, the officers filed this interlocutory appeal. The only issue raised on appeal by the officers is whether the district court erred when it rejected their claim for federal qualified immunity and state qualified immunity.

## II.   Mattos Background

On August 23, 2006, Jayzel Mattos and her husband Troy had a domestic dispute. Around 11 p.m., Jayzel asked C.M., her 14-year-old daughter, to call the police, which C.M. did. Several minutes later, Maui Police Officers Darren Agarano, Halayudha MacKnight, and Stuart Kunioka arrived at the Mattoses' residence. As the officers approached the residence, they saw Troy sitting on the top of the stairs outside the front door with a couple of open beer bottles lying nearby. Troy is six feet three inches tall, approximately 200 pounds, and he smelled of alcohol when the officers arrived. Officer Ryan Aikala arrived by himself soon after.

Kunioka approached Troy first and informed him about the 911 call. Troy told Kunioka that he and Jayzel had an argument, but he stated that nothing physical had occurred. As Kunioka continued to question Troy, Troy became agitated and rude. Kunioka asked Troy if he could speak to Jayzel to ensure that she was okay. When Troy went inside to get Jayzel, Agarano stepped inside the residence behind him. Troy returned with Jayzel and became angry when he saw Agarano inside his residence. Jayzel was initially behind Troy, but she ended up in front of him on her way to the front door to speak with the officers. Troy yelled at Agarano to get out of the residence because he had no right to be inside. Agarano asked Jayzel if he could speak to her outside.

Jayzel agreed to go outside, but before she could comply with Agarano's request, Aikala entered the residence and stood in the middle of the living room. When Aikala announced that Troy was under arrest, Jayzel was already standing in front of Troy. She did not immediately move out of the way. As Aikala moved in to arrest Troy, he pushed up against Jayzel's chest, at which point she "extended [her] arm to stop [her] breasts from being smashed against Aikala's body." Aikala then asked Jayzel, "Are you touching an officer?" At the same time, Jayzel was speaking to Agarano, asking why Troy was being arrested, attempting to defuse the situation by saying that everyone should calm down and go outside, and expressing concern that the commotion not disturb her sleeping children who were in the residence.

Then, without warning, Aikala shot his taser at Jayzel in dart-mode. *Id.* Jayzel "felt an incredible burning and painful feeling locking all of [her] joints [and] muscles and [she] f[e]ll hard on the floor." Agarano and MacKnight handcuffed Troy. Troy and Jayzel were taken into custody; Troy was charged with harassment, in violation of Hawaii Revised Statutes § 711-1106, and resisting arrest, in violation of Hawaii Revised Statutes § 710-1026, and Jayzel was charged with harassment and obstructing government operations, in viola-

tion of Hawaii Revised Statutes § 710-1010. All charges were ultimately dropped.

The Mattoses sued the officers and others for violations of their Fourth, Fifth, and Fourteenth Amendment rights based on the officers' warrantless entry into their home, their arrests, and the officers' use of the taser on Jayzel. The district court granted summary judgment to the defendants on all of the Mattoses' claims except their Fourth Amendment excessive force claim for the tasing. The district court concluded that there were material questions of fact critical to deciding whether the tasing was constitutionally reasonable, which precluded a pretrial ruling on the issue of qualified immunity. Thereafter, the officers filed this interlocutory appeal challenging the denial of their claims to qualified immunity.

## III.   Standard of Review and Jurisdiction

We review de novo a district court's denial of summary judgment on the basis of qualified immunity. *Blanford v. Sacramento County*, 406 F.3d 1110, 1114 (9th Cir. 2005). Where disputed issues of material fact exist, we assume the version of the material facts asserted by the non-moving party. *KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008). We draw all reasonable inferences in favor of the non-moving party. *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008). This court has jurisdiction to review the denial of qualified immunity pursuant to 28 U.S.C. § 1291.[2] *See Mitchell v.*

_____

[2]We note that a distinction exists between our ability to review a district court's denial of qualified immunity on summary judgment where unresolved issues of material fact exist, and our ability to review a district court's denial of summary judgment on the ground of evidentiary sufficiency. We have previously explained that the former is an appealable order while the latter is not. *See Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) ("Because [defendant] is not contesting a determination of evidentiary sufficiency, but, rather, is appealing the purely legal issue

*Forsyth*, 472 U.S. 511, 530 (1985) (holding "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

## IV.  Discussion

We begin by discussing qualified immunity and excessive force generally, and then apply these doctrines to the facts in *Brooks v. City of Seattle* and *Mattos v. Agarano*, respectively.

The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if his or her action resulted from " 'a mistake of law, a mistake of fact, or a mistake based on

---

whether or not [plaintiff's] claimed right to speak was clearly established at the time of [plaintiff's] termination, we conclude . . . that we do indeed possess appellate jurisdiction over [defendant's] appeal pursuant to 28 U.S.C. § 1291") (internal quotation marks and brackets omitted); *see also Scott v. Harris*, 550 U.S. 372, 376, 381 n.8 (2007) (explaining that a district court's denial of qualified immunity on a summary judgment motion because "there are material issues of fact on which the issue of qualified immunity turns," is reviewable as a "pure question of law" once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party") (internal quotation marks omitted). In *Brooks v. City of Seattle*, the officers do not significantly dispute Brooks's version of the material facts. They simply argue that they are entitled to qualified immunity as a matter of law. In *Mattos v. Agarano*, although the district court found that there were unresolved material issues of fact, the officers argue in this appeal that they are entitled to qualified immunity as a matter of law even assuming the Mattoses' version of the facts and drawing all reasonable inferences in their favor.

mixed questions of law and fact.' " *Id*. (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In determining whether an officer is entitled to qualified immunity, we employ a two-step test: first, we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is "yes," we proceed to determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *cert. denied*, 130 S. Ct. 1047 (2010). The Supreme Court has instructed that we may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 129 S. Ct. at 818. Here, we follow the *Saucier* order as recited above, because this "two-step procedure promotes the development of constitutional precedent" in an area where this court's guidance is sorely needed.[3] *Id.*

**[1]** For the first step—whether the official violated a constitutional right—we begin by looking to the Supreme Court's guidance on the excessive use of force in *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the Court instructed that

---

[3]*See Bryan v. MacPherson*, 630 F.3d 805, 832-33 (9th Cir. 2010) (holding that although the plaintiff alleged a constitutional violation, the defendant was entitled to qualified immunity because the law was not clearly established at the time of the conduct); *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1110 (9th Cir. 2010) (same); *Delia v. City of Rialto*, 621 F.3d 1069, 1071 (9th Cir. 2010) (same) *cert. granted*, 79 U.S.L.W. 3480, 80 U.S.L.W. 3015 (U.S. Sept. 27, 2011) (No. 10-1018); *Stoot v. City of Everett*, 582 F.3d 910, 921-22 (9th Cir. 2009) (same), *cert. denied*, 130 S. Ct. 2343 (2010).

"[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted). More recently, the Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts "must still slosh [their] way through the factbound morass of 'reasonableness.' Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable." *Scott v. Harris*, 550 U.S. 372, 383 (2007).

**[2]** We apply *Graham* by first considering the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001). As we have previously explained, "[t]hese factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.' " *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

In *Scott*, for example, the Supreme Court considered whether a police officer used constitutionally excessive force when he ran a fleeing motorist off the road to "stop [the motorist's] . . . public-endangering flight by ramming the motorist's car from behind." 550 U.S. at 374. In assessing the governmental interests at stake, the Court asked, "[H]ow does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person?" *Id.*

at 384. The Court thought "it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability." *Id.* Thus, in assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case.

Ultimately, the " 'most important' " *Graham* factor is whether the suspect posed an " 'immediate threat to the safety of the officers or others.' " *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). We explained in *Deorle* that when we consider whether there was an immediate threat, a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." 272 F.3d at 1281.

For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—we ask whether its contours were " 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). We are particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry. If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the

Fourth Amendment. *See Deorle*, 272 F.3d at 1286 ("Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."). That result would not properly balance the competing goals to "hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 129 S. Ct. at 815.

We are careful, however, to apply the "clearly established" rule in such a way that faithfully guards " 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' " *Harlow*, 457 U.S. at 807 (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)). We must also allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Finally, *Graham*'s general excessive force standard cannot always, alone, provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (per curiam) (explaining that *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985), "are cast at a high level of generality" and cannot, in every case, "offer a basis for decision"). The Supreme Court has stated, however, that "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Id.* at 199 (citing *Hope*, 536 U.S. at 738). Although this "obvious case" exception remains good law, the Supreme Court recently clarified that the bar for finding such obviousness is quite high. In *al-Kidd*, the Court emphasized that it has "repeatedly told courts not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in

determining whether the violative nature of particular conduct is clearly established." 131 S. Ct. at 2084 (citations omitted). With these principles in mind, we turn to the cases before us.

## A.   *Brooks v. City of Seattle*

### 1.   Defendant Officers Used Excessive Force Against Brooks

**[3]** We begin by considering the nature and quality of the force used against Brooks: a taser in drive-stun mode. We have previously described the force involved when a taser is deployed in dart-mode. *See Bryan*, 630 F.3d 805. In *Bryan*, we explained that in dart-mode the taser

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires— toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge . . . The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

*Id.* at 824 (footnote omitted). When a taser is used in drive-stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode. Each of the three times that Jones tased Brooks in drive-stun mode, the shock was "extremely painful." In *Bryan*, we held that tasers used in dart-mode "constitute an intermediate, significant level of force." *Id.* at 826.

**[4]** Here, the record is not sufficient for us to determine what level of force is used when a taser is deployed in drive-

stun mode. We follow the Supreme Court's guidance in *Scott*, however, and need not decide this issue in order to assess the reasonableness of the tasing. *See* 550 U.S. at 383 ("Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable."). Instead, we proceed to determine whether Jones's use of the taser against Brooks in this case was reasonable, keeping in mind the magnitude of the electric shock at issue and the extreme pain that Brooks experienced. *See Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009) (noting that a woman who was tased in drive-stun mode experienced "extreme pain" and "felt a sharp pain where the Taser met her arm, with the pain radiating from her upper arm and causing her muscles to clench").

In evaluating the reasonableness of Jones's action, we consider the governmental interests at stake and begin with (1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.[4] *Deorle*, 272 F.3d at 1279-80.

---

[4]Brooks argues that the officers lacked probable cause to arrest her and therefore that they could not use *any* amount of force against her. The district court addressed this argument, concluding that "she is wrong as a matter of law." We need not decide whether the officers had probable cause to effect a custodial arrest pursuant to Washington law because the answer does not affect Brooks's Fourth Amendment excessive force claim. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."). In addition, we have explained that "establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F. 3d 912, 921-22 (9th Cir. 2001)).

**[5]** According to the facts as alleged by Brooks, the officers pulled her over for speeding and then detained and took her into custody because she refused to sign a traffic citation. She refused to sign the citation after she gave Ornelas her driver's license and he spent five minutes in his squad car with the license, presumably checking the status of her license. We appreciate the danger associated with speeding, and we do not minimize the particular importance of observing school zone speed limits. We also recognize the importance of having people sign their traffic citations when required to do so by state law. However, we have no difficulty deciding that failing to sign a traffic citation and driving 32 miles per hour in a 20-mile-per-hour zone are not serious offenses. Indeed, our case law demonstrates that far more serious offenses than Brooks's do not constitute severe crimes in a *Graham* analysis. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (noting that trespassing and obstructing a police officer were not severe crimes); *City of Hemet*, 394 F.3d at 702 (concluding that suspect was not "particularly dangerous" and his offense was not "especially egregious" where his wife had "called 911 to report that her husband 'was hitting her and/or was physical with her,' [and] that he had grabbed her breast very hard").

**[6]** We next consider whether Brooks "posed an immediate threat to the safety of the officers or others." *Deorle*, 272 F.3d at 1280 (internal quotation marks omitted). When the encounter began, Brooks was compliant: she pulled over when signaled to do so, gave her driver's license to Ornelas when asked, and waited in her car while Ornelas checked her information. When Ornelas returned and informed Brooks that he was going to cite her for the speeding violation, she became upset and proceeded to become increasingly agitated and uncooperative as the incident evolved. At no time did Brooks verbally threaten the officers. She gave no indication of being armed and, behind the wheel of her car, she was not physically threatening. At most, the officers may have found her uncooperative and her agitated behavior to be potentially

threatening while Brooks's keys remained in the ignition of her car. In theory, she could have attempted to drive away rapidly and recklessly, threatening the safety of bystanders or the officers. But at some point after Ornelas grabbed Brooks's arm and before Jones applied the taser to her, Ornelas removed the keys from Brooks's car ignition and the keys dropped to the car's floor. Thus, at the time Jones applied the taser to Brooks, she no longer posed even a *potential* threat to the officers' or others' safety, much less an "immediate threat."[5] *Deorle*, 272 F.3d at 1280. We reiterate that this is the " 'most important single element' " of the governmental interests at stake. *City of Hemet*, 394 F.3d at 702 (quoting *Chew*, 27 F.3d at 1441).

**[7]** The third governmental interest factor in the *Graham* test is whether Brooks was "actively resisting arrest or

_____

[5]In his Concurrence and Dissent ("Kozinski Concurrence"), Chief Judge Kozinski claims that when Brooks's car keys lay on the floor of her car, she posed a threat to the officers and to innocent bystanders because she "might've been able to reach it, start up the car and drive away," and she "might also have had a spare key." Kozinski Concurrence at 19045. There is no evidence in the record that Brooks attempted to reach for the keys after Officer Ornelas removed them from the ignition. Nor is there any evidence in the record that she reached for her purse or the glove-box, potentially to look for a spare key. Moreover, Brooks was seven months pregnant and therefore not likely able to reach down past the steering wheel of her car to the floor under her driver's seat in order to retrieve the keys. Rather than viewing the evidence in the light most favorable to Brooks, Chief Judge Kozinski flips the summary judgment standard on its head by taking the evidence in the light most favorable to the defendants. We are *required*, however, to take the facts in the light most favorable to Brooks at this stage. *Saucier*, 121 S.Ct. at 2156; *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007). When Chief Judge Kozinski asserts that Brooks was an immediate threat who had to be neutralized by repeated tasings, he does more than ignore the proper summary judgment standard. He engages in rank speculation, imagining possibilities—like a spare key—that the officers have not even alleged. Because there is simply no evidence that Brooks sought to drive off or otherwise flee, we cannot properly point to this possibility as evidence that she posed an immediate threat to anyone.

attempting to evade arrest by flight, and any other exigent cir-
cumstances that existed at the time of the arrest." *Deorle*, 272
F.3d at 1280 (internal quotation marks omitted). Brooks
refused to get out of her car when requested to do so and later
stiffened her body and clutched her steering wheel to frustrate
the officers' efforts to remove her from her car. In other
words, she resisted arrest. *See Chew*, 27 F.3d at 1442 (fleeing
and hiding from the police constitutes resisting arrest in the
*Graham* context). We observe, however, that Brooks's resis-
tence did not involve any violent actions towards the officers.
In addition, Brooks did not attempt to flee, and there were no
other exigent circumstances at the time. The facts reflect that
the officers proceeded deliberately and thoughtfully, taking an
aside in the midst of the incident to discuss where they should
tase Brooks after they found out she was pregnant. There is
no allegation that an exigent circumstance requiring the atten-
tion of one of the three officers existed *somewhere else*, so
that the encounter with Brooks had to be resolved as quickly
as possible. Still, Brooks engaged in some resistance to arrest.

[8] Finally, we must examine the totality of the circum-
stances and consider " 'whatever specific factors may be
appropriate in a particular case, whether or not listed in *Gra-
ham*.' " *Bryan*, 630 F.3d at 826 (quoting *Franklin*, 31 F.3d at
876). We note that Brooks bears some responsibility for the
escalation of this incident, which influences the totality of
these circumstances. There are, however, two other specific
factors in this case that we find overwhelmingly salient. First,
Brooks told Jones, before he tased her, that she was pregnant
and less than 60 days from her due date. And as explained
above, Jones and Ornelas paused after they learned she was
pregnant and discussed where they should tase Brooks in light
of this information. The record unambiguously reflects that
the officers knew about and considered Brooks's pregnancy
before tasing her.

[9] The second overwhelmingly salient factor here is that
Jones tased Brooks three times over the course of less than

one minute. Twenty-seven seconds after Jones cycled his taser as a warning, he applied the taser to Brooks. Thirty-six seconds later, he tased Brooks for the second time. Six seconds after that, Jones tased Brooks for the third time. Each time, Brooks cried out in pain. Three tasings in such rapid succession provided no time for Brooks to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply.

In sum, Brooks's alleged offenses were minor. She did not pose an immediate threat to the safety of the officers or others. She actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. Brooks did not evade arrest by flight, and no other exigent circumstances existed at the time. She was seven months pregnant, which the officers knew, and they tased her three times within less than one minute, inflicting extreme pain on Brooks.

**[10]** A reasonable fact-finder could conclude, taking the evidence in the light most favorable to Brooks, that the officers' use of force was unreasonable and therefore constitutionally excessive.[6] *Compare Bryan*, 630 F.3d at 832 (holding that the plaintiff alleged a constitutional violation where he was tased in dart mode even though he "was neither a flight risk, a dangerous felon, nor an immediate threat"), *and Parker*

---

[6]In arriving at a different conclusion about the tasing in *Brooks*—and in *Mattos*—than we do, Chief Judge Kozinski expresses vivid disapproval of Brooks's behavior. His "covenant of cooperation" may be good manners, but we do not view it as driving the *Graham* excessive force analysis. Though failure to cooperate may be a relevant consideration, it is not the primary factor that we are directed to consider. We must consider all of the circumstances surrounding an alleged use of excessive force. Were we to adopt Chief Judge Kozinski's approach, just about any breach of the "covenant of cooperation" would foreclose a Fourth Amendment excessive force claim. We decline to adopt such an approach, which would be contrary to the firmly established *Graham* analysis.

*v. Gerrish*, 547 F.3d 1 (1st Cir. 2008) (upholding a jury verdict for excessive force used against a driver stopped for speeding who admitted to drinking, exchanged hostile words with an officer, and initially resisted arrest before being tased), *with Cook v. City of Bella Villa*, 582 F.3d 840 (8th Cir. 2009) (finding no excessive force where a lone officer tased the passenger of a car after he pulled the car over around midnight, three people got out of the car and immediately started yelling at the officer, and one passenger took a threatening step towards the officer).[7]

### 2. Defendant Officers Did Not Violate Clearly Established Law When They Tased Brooks

Having determined that Brooks alleged a Fourth Amendment violation, we next consider whether the officers are nonetheless entitled to qualified immunity. That is, at the time the officers tased Brooks, was the constitutional violation described above " 'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right[?]' " *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640).

[11] We begin our inquiry into whether this constitutional violation was clearly established by looking at the most analogous case law that existed when the officers tased Brooks in November 2004. At that time, there were three relevant opinions from several of our sister circuits. In *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992), the Sixth Circuit held that the defendant officers did not violate the Fourth Amendment when they tased Thomas Bubenhofer.

---

[7]In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992); *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993); and *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), our sister circuits held that the respective tasings did not violate clearly established law. As discussed *infra*, Part IV.A.2., the facts in those cases are plainly distinguishable from the facts in *Brooks*. We therefore do not find their holdings instructive with respect to the first prong of the *Saucier* test.

Bubenhofer's family called the police to help them return him to a psychiatric institute; the officers who responded to the call heard over the police radio that Bubenhofer "was a walk-away from [the psychiatric institute] who was 'suicidal, homicidal, and a hazard to police.' " *Id.* at 1039. When the defendant officers tried to get Bubenhofer out of his apartment, Bubenhofer "threatened to kill anyone who entered the apartment" and then opened the door and stood in the doorway, holding "a knife in each hand with the blades pointed at the officers." *Id.* at 1040. The second time Bubenhofer opened the door, again displaying the knives toward the officers, one of the officers tased him several times. *Id.* Bubenhofer overcame the effects of the taser and rushed toward the officers, still holding the knives. *Id.* at 1040. The hostilities continued and the officers tased Bubenhofer again—this time as he lay at the bottom of a stairwell, at which "point [he] posed no immediate threat to the officers." *Id.* at 1045. The Sixth Circuit held that, as to the initial uses of the taser, "plaintiffs have failed to show that clearly established law at the time of the incident declared such actions unconstitutional." *Id.* at 1044. As for the subsequent tasings, the court held that it "[could] not conclude that they constituted a show of excessive force." *Id.* at 1045.

Although *Russo* is relevant to our clearly established inquiry because it involves the use of a taser, we note that the facts in *Russo* are readily distinguishable from the facts in *Brooks*. Brooks, unlike Bubenhofer, was not a paranoid schizophrenic, *id.* at 1039, did not make homicidal and suicidal threats to the police, *id.* at 1040, did not hold a knife in each hand with the blades pointed at the officers, *id.*, and did not overcome the effects of being tased multiple times to approach the officers with knives still in hand, *id.* at 1040-41.

In *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993), the Tenth Circuit also held that the defendant officers did not violate the Fourth Amendment when they tased the plaintiff. The court explained that "[u]ndeniably, the first two [*Graham*] criteria weigh in favor of Hinton's claim that [the

officers'] use of force was constitutionally excessive." *Id.* at 781. "The crime for which Hinton was initially stopped by the police was the misdemeanor of disturbing the peace. Furthermore, it is difficult to maintain that Hinton constituted any type of immediate threat to the police or the public." *Id.* Only the third *Graham* factor weighed against Hinton's excessive force claim. *Id.* After Hinton declined the officers' request to speak to him, "Hinton shoved [an officer] out of his way." *Id.* at 776. An officer then informed Hinton that he was under arrest, at which point "Hinton continued to struggle with [the officers] by kicking his feet, flailing his arms, and biting the officers . . . ." *Id.* at 777. The Tenth Circuit held that "Hinton has failed to demonstrate that [the officers'] conduct amounted to a violation of the law." *Id.* at 782.

Again, while *Hinton* is relevant to our inquiry into whether the constitutional violation that Brooks suffered was clearly established, the facts in that case are dissimilar to the facts in *Brooks.* In the context of a Fourth Amendment fact-specific reasonableness inquiry, we see little determinative similarity between a suspect who shoved, kicked, and bit law enforcement officers, and a suspect who stiffened her body and clutched her steering wheel to frustrate officers' attempts to remove her from her car.

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), is the third taser case that was decided before Brooks was tased. In *Draper*, at 11:30 p.m., a lone officer pulled over the plaintiff, who was driving a tractor trailer truck, "because its tag light was not appropriately illuminated under Georgia law." *Id.* at 1272. During the ensuing traffic stop, the plaintiff "acted in a confrontational and agitated manner, paced back and forth, and repeatedly yelled at [the officer]." *Id.* at 1276-77. When the plaintiff failed to comply with the officer's fifth request to produce certain documents, the officer tased him. *Id.* at 1273. The Eleventh Circuit held that the "use of the taser gun to effectuate the arrest of [the plaintiff] was reasonably proportionate to the difficult, tense and uncertain situation that [the

defendant officer] faced in this traffic stop, and did not consti-
tute excessive force." *Id.* at 1278. *Draper* presents the most
analogous facts to *Brooks*, but we still see significant differ-
ences. Unlike the plaintiff in *Draper*, Brooks was immobile
in her car in daylight and the police outnumbered her three to
one when they tased her.

**[12]** In sum, when the defendant officers tased Brooks,
there were three circuit courts of appeals cases rejecting
claims that the use of a taser constituted excessive force; there
were no circuit taser cases finding a Fourth Amendment vio-
lation. *Russo*, *Hinton*, and *Draper* are factually distinguish-
able from *Brooks*. Indeed we have concluded that—unlike the
plaintiffs in those cases—Brooks has alleged a Fourth
Amendment violation. We cannot conclude, however, in light
of these existing precedents, that "*every* 'reasonable official
would have understood' . . . *beyond debate*" that tasing
Brooks in these circumstances constituted excessive force. *al-
Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640)
(emphasis added) (citation omitted). Moreover, the violation
was not so obvious that we can "define clearly established law
at a high level of generality," finding that *Graham* alone ren-
ders the unconstitutionality of Brooks's tasing clearly estab-
lished. *Id.* at 2084.

We therefore follow the example of our court's three-judge
panel in *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010).
In *Bryan*, we held that the use of a taser constituted excessive
force, but we concluded that the defendant officer was entitled
to qualified immunity. The tasing in *Bryan* took place in
2005, and we observed that in that year "there was no
Supreme Court decision or decision of our court addressing"
the use of a taser in dart mode. *Id.* at 833. As a result, we con-
cluded that "a reasonable officer in Officer MacPherson's
position could have made a reasonable mistake of law regard-
ing the constitutionality of the taser use in the circumstances"
confronted. *Id.*

**[13]** Thus, we conclude that, although Brooks has alleged an excessive force claim, the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established. Accordingly, the defendant officers are entitled to the defense of qualified immunity against Brooks's § 1983 excessive force claim.**[8]**

## B.  *Mattos v. Agarano*

### 1.  Defendant Officers Used Excessive Force Against Mattos

**[14]** Determining whether the force used against Jayzel Mattos was constitutionally excessive, we begin again by considering the nature and quality of the force used. Here, the taser was employed in dart-mode, which we have held "constitute[s] an intermediate, significant level of force." *Bryan*, 630 F.3d at 826. The taser's aluminum darts penetrated Jayzel's skin and delivered the intended dart-mode response: "[t]he electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. *Id.* at 824. Jayzel "felt an incredible burning and painful feeling locking all of [her] joints [and] muscles and [she] f[e]ll hard on the floor." It is against this backdrop that we consider the governmental interests at stake and the ultimate reasonableness of the officers' action.

**[15]** Considering the first governmental interest factor, the severity of the crime at issue, we are mindful that we must construe the facts in the light most favorable to Jayzel at this

---

**[8]**Because we conclude that a reasonable jury could find that the officers used excessive force in tasing Brooks, we affirm the district court's conclusion that the officers are not entitled to Washington state qualified immunity for Brooks's assault and battery claims. *See Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000) ("Nor is state qualified immunity available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest.").

stage. *See KRL*, 512 F.3d at 1188-89. When Jayzel appeared in the hallway, Agarano asked to speak to Jayzel outside; she agreed, but before she could comply, Aikala entered the residence. When Aikala announced that Troy was under arrest, Jayzel was already standing in front of Troy. She did not immediately move out of the way. As Aikala moved in to arrest Troy, he pushed up against Jayzel's chest, at which point she "extended [her] arm to stop [her] breasts from being smashed against Aikala's body." Aikala then asked Jayzel, "Are you touching an officer?" At the same time, Jayzel was speaking to Agarano, asking why Troy was being arrested, attempting to defuse the situation by saying that everyone should calm down and go outside, and expressing concern that the commotion might disturb her sleeping children who were in the residence. Taking the evidence in the light most favorable to Jayzel, and resolving all conflicts in her favor, the most that can be said about her actions is that, while standing between Troy and Aikala, she attempted to prevent Aikala from pressing up against her breasts. While this may have momentarily deterred Aikala's immediate access to Troy, it did not rise to the level of obstruction. Thus, under *Graham*, the severity of the crime, if any, was minimal.

**[16]** The next, and most important, *Graham* factor is whether "the *suspect* posed an immediate threat to the safety of the officers or others." *Deorle*, 272 F.3d at 1280 (internal quotation marks omitted) (emphasis added). Here, Jayzel was the "suspect" against whom force was used, so we consider whether *she* posed an immediate threat to the officers' safety. The officers came to the residence in response to a 911 call made at Jayzel's request during a domestic dispute with Troy. Once the officers arrived and saw Jayzel, there were no objective reasons to believe that she was armed, she did not verbally threaten the officers, and her only physical contact with Aikala resulted from her defensively raising her hands to prevent him from pressing his body against hers after he came into contact with her. Jayzel's main contribution to the scene consisted of repeatedly entreating the officers and her hus-

band to calm down and go outside so that her sleeping children would not be awakened. Jayzel posed no threat to the officers.

**[17]** The third enumerated governmental interest factor is whether Jayzel was actively resisting arrest or attempting to evade arrest by flight. *Deorle*, 272 F.3d at 1280. According to Jayzel's rendition of the facts, the most that can be said is that she minimally resisted Troy's arrest. She was standing between Aikala and Troy *before* Aikala moved in to arrest Troy, and her physical contact with Aikala was defensive, intended to protect her own body from contact with Aikala. That being said, when Aikala stated that Troy was under arrest, Jayzel did not immediately move out of the way to facilitate the arrest. For the purposes of this *Graham* factor, however, we draw a distinction between a failure to facilitate an arrest and active resistance to arrest. Moreover, the crux of this *Graham* factor is compliance with the officers' requests, or refusal to comply. Here, Jayzel was attempting to comply with Agarano's request to speak with her outside when she got physically caught in the middle between Aikala and Troy. Accordingly, this factor weighs in Jayzel's favor.

Finally, it is important in this case that we consider the additional " 'specific factors'" relevant to the totality of these circumstances. *Bryan*, 630 F.3d at 826 (quoting *Franklin*, 31 F.3d at 876). While Jayzel herself did not pose any threat to the officers' safety, we must also consider the danger that the overall situation posed to the officers' safety and what effect that has on the reasonableness of the officers' actions. As we have recounted, the officers came to the Mattoses' residence in response to a 911 domestic dispute call. When they arrived they encountered Troy, who was sitting by himself outside the residence, hostile, seemingly intoxicated, six feet three inches tall and approximately 200 pounds. We have observed that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond

to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (internal quotation marks and citation omitted). We have also "recognized that the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." *United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) (internal quotation marks omitted).

**[18]** We take very seriously the danger that domestic disputes pose to law enforcement officers, and we have no trouble concluding that a reasonable officer arriving at the Mattoses' residence reasonably could be concerned about his or her safety. In light of such concerns, we have recognized that "the exigencies of domestic abuse cases present dangers that . . . may override considerations of privacy" where the alleged Fourth Amendment violation was a warrantless entry into a residence for the purpose of intervening in a domestic dispute, protecting the potential victim, and gaining control over a volatile situation that could endanger the officers. *Id.*; *see Martinez*, 406 F.3d at 1165; *United States v. Brooks*, 367 F.3d 1128, 1133-34 (9th Cir. 2004). Here, though, the alleged Fourth Amendment violation is the excessive use of force against the potential non-threatening victim of the domestic dispute whom the officers ostensibly came to protect. Our previous reasoning for providing some Fourth Amendment leeway to officers who must enter a residence without a warrant in response to domestic disputes does not logically extend to officers who use an intermediate level of force on the non-threatening victim of a domestic dispute whom they have come to protect—especially when the domestic dispute is seemingly over by the time the officers begin their investigation.

In drawing this distinction, we are guided by the Supreme Court's reasoning in *Scott.* There, the Court observed that in weighing the *Graham* governmental interests in a situation

where someone is likely to get hurt—either a fleeing suspect or innocent bystanders—it is "appropriate in this process to take into account . . . relative culpability." *Scott*, 550 U.S. at 384. Given the procedural posture at this stage of the proceedings, we cannot say that Jayzel was culpable in this situation. We understand that Jayzel was unintentionally in the way when Aikala attempted to gain control over a potentially dangerous situation by arresting Troy, and we appreciate that "police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. At the same time, we are unable to identify any reasonableness in the conclusion—whether made in a split-second or after careful deliberation—that tasing the innocent wife of a large, drunk, angry man when there is no threat that either spouse has a weapon, is a prudent way to defuse a potentially, but not yet, dangerous situation. *See Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."). We stress that this unreasonableness is compounded by the officers' knowledge that there were children present in the home at the time.

**[19]** Finally, the fact that Aikala gave no warning to Jayzel before tasing her pushes this use of force far beyond the pale. We have previously concluded that an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation. *See Bryan*, 630 F.3d at 831; *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004); *Deorle*, 272 F.3d at 1284; *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (denying qualified immunity for the use of a taser where the "absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling").

**[20]** To summarize, Aikala used the intermediate force of a taser in dart-mode on Jayzel after he and the other officers

arrived to ensure her safety. Her offense was minimal at most. She posed no threat to the officers. She minimally resisted Troy's arrest while attempting to protect her own body and to comply with Agarano's request that she speak to him outside, and she begged everyone not to wake her sleeping children. She bears minimal culpability for the escalation of the situation. The officers were faced with a *potentially* dangerous domestic dispute situation in which they reasonably felt that Troy could physically harm them if he chose to, but there was no indication that Troy intended to harm the officers or that he was armed. When Aikala encountered slight difficulty in arresting Troy because Jayzel was between the two men, Aikala tased her without warning. Considering the totality of these circumstances, we fail to see any reasonableness in the use of a taser in dart-mode against Jayzel. When all the material factual disputes are resolved in Jayzel's favor and the evidence is viewed in the light most favorable to her, we conclude that she has alleged a Fourth Amendment violation. That is, a reasonable fact finder could conclude that the officers' use of force against Jayzel, as alleged, was constitutionally excessive in violation of the Fourth Amendment. *See Brown*, 574 F.3d 491 (denying qualified immunity to officers who tased the passenger-wife of a driver who evaded their initial attempts to pull him over when the wife refused to hang up the 911 call she made after the officers pulled her husband out of the car, threw him against the car, and handcuffed him); *Bryan*, 630 F.3d at 832 (holding that the plaintiff alleged a constitutional violation where he was tased in dart mode even though he "was neither a flight risk, a dangerous felon, nor an immediate threat").[9]

---

[9]Again, *Russo*, *Hinton*, and *Draper* are so factually dissimilar from *Mattos* that we do not find them useful for the first prong of the *Saucier* test.

## 2. Defendant Officers Did Not Violate Clearly Established Law When They Tased Mattos

We next turn to whether the officers are entitled to qualified immunity for the force they used against Jayzel in August 2006. Here, as above, we must determine whether the constitutional violation was " 'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right.' " *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640).

**[21]** As in *Brooks v. City of Seattle* and *Bryan v. MacPherson*, we conclude that the alleged constitutional violation in *Mattos* was not clearly established when the conduct occurred. At the time, "there was no Supreme Court decision or decision of our court addressing" the use of a taser in dart mode. *Bryan*, 630 F.3d at 833. In addition, as we explained above, none of the three existing federal court of appeals cases dealing with tasers found a constitutional violation. Even though the facts in *Mattos* are readily distinguishable from the facts in *Russo*, *Hinton*, and *Draper*, the violation was not so obvious that we can rely on the *Graham* factors and define the contours of clearly established law at a high level of generality. *See al-Kidd*, 131 S. Ct. at 2084. Accordingly, we conclude that the officers here are entitled to qualified immunity for tasing Jayzel.

## V. Conclusion

For the foregoing reasons, we conclude that Brooks and the Mattoses have alleged constitutional violations, but that not every reasonable officer at the time of the respective incidents would have known—beyond debate—that such conduct violates the Fourth Amendment. Accordingly, we reverse the district courts' denial of summary judgment on qualified immunity grounds on Plaintiffs' § 1983 excessive force claims. In *Brooks*, however, we affirm the district court's

denial of qualified immunity on Brooks's state law assault and battery claims.

No. 08-15567 **REVERSED**.

No. 08-35526 **REVERSED in part and AFFIRMED in part**.

SCHROEDER, Circuit Judge, concurring:

I agree that in the absence of cases recognizing any specific use of taser weapons as excessive force, the defendants are entitled to qualified immunity under the Supreme Court's teaching in *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084 (2011). I also agree wholeheartedly with the majority opinion by Judge Paez that the use of such force in the cases before us was excessive.

I write separately only to emphasize the non-threatening nature of the plaintiffs' conduct. Both were women, with children nearby, who were tased after engaging in no threatening conduct. In *Mattos*, a domestic violence victim wanted the officers outside her home so they would not awaken her children. In *Brooks*, the police stopped the pregnant plaintiff for speeding in front of her child's school — when she refused to sign the traffic ticket and exit the vehicle, the police tased her. Her behavior may be difficult to understand, but it certainly posed no immediate threat to the officers.

It is the threatening nature of the plaintiffs' conduct that justified the use of the taser in the cases Judge Kozinski could rely upon. *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004); *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993); *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992). When evaluating the use of any force, a prime consideration is always whether the suspect posed an immediate

threat to the safety of the officers. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).

The relevant out of circuit cases upholding tasings all involved the tasing of threatening men. *Draper* was described as a "belligerent" truck driver. *Hinton* was an "angry" town resident whose dog had been impounded, and who then threatened the animal control officer and kicked and actually bit the arresting officers. *Russo* was deranged, barricaded himself in his apartment after leaving a psychiatric facility, and then came after the police with butcher knives. This is not to suggest that only men can be threatening, but that these women were not.

Moreover, Judge Kozinski's partial concurrence reflects some serious misunderstanding of each woman's situation. While Judge Kozinski focuses on the fact that Brooks' baby was born healthy, the focus should be on whether the officers had properly taken into account the risk of harm to the child in using the taser. *See Torres v. City of Madera*, 648 F.3d 1119, 1126 (9th Cir. 2011) ("[A] jury might question the reasonableness of choosing to send 1,200 volts of electricity through a person when the alleged concern is for that person's safety.") (footnote omitted). Judge Kozinski's underlying assumption in *Mattos*, that violence is gender-blind, and concerns for womens' safety thus "chauvinistic," overlooks the worldwide struggle to combat violence against women. *See, e.g.*, Violence Against Women Act, *codified at* 42 U.S.C. §§ 3796gg, 13925 *et seq*.

One could argue that the use of painful, permanently scarring weaponry on non-threatening individuals, who were not trying to escape, should have been known to be excessive by any informed police officer under the long established standards of *Graham*. The Eleventh Circuit has recently held that police officers using a taser were not entitled to qualified immunity where no threat, or escape, was imminent. *Fils v.*

*City of Aventura*, 647 F.3d 1272, 1289, 1292 (11th Cir. 2011). Nevertheless, the Supreme Court's opinion in *al-Kidd* appears to require us to hold that because there was no established case law recognizing taser use as excessive in similar circumstances, immunity is required. *al-Kidd*, 131 S.Ct. at 2084 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal citation omitted). I therefore concur in Judge Paez's good opinion.

---

Chief Judge KOZINSKI, joined by Judge BEA, concurring in part and dissenting in part:

By asking police to serve and protect us, we citizens agree to comply with their instructions and cooperate with their investigations. Unfortunately, not all of us hold up our end of the bargain. As a result, officers face an ever-present risk that routine police work will suddenly become dangerous. In the last decade, more than half a million police were assaulted in the line of duty. More than 160,000 were injured, and 536 were killed—the vast majority while performing routine law enforcement tasks like conducting traffic stops and responding to domestic disturbance calls. Criminal Justice Info. Servs. Div., Fed. Bureau of Investigation, *Law Enforcement Officers Killed & Assaulted, 2009* (Oct. 2010), http://www2.fbi.gov/ucr/killed/2009/aboutleoka.html (tables 19 and 70).

Brooks and Mattos breached the covenant of cooperation by refusing to comply with police orders. When citizens do that, police must bring the situation under control, and they have a number of tools at their disposal. Traditional tools, such as choke holds, arm locks and other hand-to-hand techniques, can cause permanent injury, even death. The standard issue baton "is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes."

*Young* v. *Cnty. of Los Angeles*, No. 09-56372, slip op. 16,441, 16,454 (9th Cir. Aug 26, 2011); *see also id.* at 16,453 (pepper spray is no fun either). These methods are also distasteful to officers, who can deploy such close-range tactics only by stepping in harm's way.

The Taser is a safe alternative: It's effective at a range of fifteen to thirty-five feet, so officers can use it without engaging in personal combat. And a study by six university departments of emergency medicine found that 99.7 percent of those Tased by police suffer no injuries or, at most, mild ones. William P. Bozeman et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Against Criminal Suspects*, 53 Annals Emergency Med. 480, 484 (2009). The research division of the Department of Justice concluded that Taser deployment "has a margin of safety as great or greater than most alternatives," and carries a "significantly lower risk of injury than physical force." John H. Laub, Director, Nat'l Inst. of Justice, *Study of Deaths Following Electro Muscular Disruption* 30-31 (2011).

Cases in point: Malaika Brooks and Jayzel Mattos. Brooks actively resisted arrest; Mattos refused to get out of the way when police tried to arrest her large, drunk, angry husband. In each case, the arresting officers deployed a Taser and were able to defuse the situation without anyone getting seriously hurt. We can't be sure the results would have been as good had the police used other methods.

The Fourth Amendment proscribes only *unreasonable* searches and seizures. Police need not use the least necessary force, *see Luchtel* v. *Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010), but the officers here did just that. Nevertheless, the majority finds their actions unconstitutional, and thereby deters officers from employing a safe, effective technique for subduing uncooperative subjects. This will cause police to resort to more dangerous methods in the future. Count me out.

### Brooks v. City of Seattle

Pulled over for speeding in a school zone, Brooks found herself in a situation familiar to motorists. Every year, millions of people get traffic tickets. No one likes it, but we set our resentment aside, sign our citations and move on. Not Brooks. Officer Ornelas gave her a ticket in the normal course, but Brooks denied speeding and refused to sign. Ornelas assured Brooks that she wouldn't admit guilt by signing, but she still refused. When Officer Jones stopped to assist, he told Brooks she was required by law to sign and reiterated that she wouldn't admit guilt by doing so. Jones pointed to the writing at the bottom of the ticket, which read: "Without admitting to having committed each of the above offenses, by signing this document I acknowledge receipt of this notice of infraction and promise to respond as directed on this notice." Brooks called Jones a liar and again denied speeding. Jones showed her the reading on the radar gun, but Brooks claimed it had clocked the car in front of her. She remained defiant even after Jones told her she'd be arrested if she continued to refuse.

In an attempt to resolve the situation short of an arrest, Jones called Sergeant Daman, who arrived five minutes later, approached Brooks and introduced himself as the other officers' supervisor. By then, Brooks was "irrational, screaming and out of control," but Daman gave her another chance to sign the ticket instead of going to jail.

When Brooks still refused, Daman ordered Ornelas and Jones to arrest her. Ornelas told Brooks to get out of her car, but she refused. In further effort to avoid using force, Jones told Brooks he'd Tase her if she wouldn't leave the car. He removed the darts from his Taser, told Brooks the device would cause pain if he were required to use it, and cycled it so she could see and hear its electric current. Brooks didn't get out, so the officers tried to extract her, but she "wrapped

her arm around the steering column . . . and wedged her body into the driver's seat."

What were the officers supposed to do at that point? Brooks had shown herself deaf to reason, and moderate physical force had only led to further entrenchment. The officers couldn't just walk away—Brooks was under arrest. Moreover, Brooks was behaving erratically, and her keys were in the car. The officers had to physically control her somehow, lest she manage to start up the engine and run someone over. How long was this stalemate supposed to go on? Brooks was tying up two line officers, a sergeant and three police vehicles—resources diverted from other community functions—to deal with one lousy traffic ticket.

The majority casts aspersions on what the officers did here, condemning their decision to Tase Brooks as unconstitutional. But, even with the benefit of hindsight and plenty of time to think about it, my colleagues offer no alternative course of action. They ignore the significant fact that, at the time Brooks was Tased, she was no longer a random motorist getting a traffic ticket; she was under arrest. As the Supreme Court has recognized, making an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham* v. *Connor*, 490 U.S. 386, 396 (1989). When police effect an arrest, their relationship with the citizen changes in a material way: The citizen is now subject to the officers' control and has a lawful duty to submit to their authority; failure to do so is a crime. By her own willful conduct, Brooks delivered herself to the power of the officers and the force necessary for them to complete the arrest.

Nor do my colleagues explain why Brooks's pregnancy renders the officers' actions any less reasonable. Should the officers have slammed Brooks's fingers with a baton to make her let go of the steering column? Forcibly ripped her from the driver's seat, smashing her abdomen against the steering wheel? Doused her with pepper spray or some other noxious

chemical, which would be absorbed into her bloodstream and go straight to the fetus? Those options all involved serious risk of harm to both Brooks and her unborn daughter. Had the officers tried them, we'd still be here, only Brooks would have a stronger case.

Having already warned Brooks that he'd Tase her if she wouldn't comply, Jones tried the lightest possible application of the device, pressing it against her clothed thigh for five seconds. Brooks continued to resist, so Jones applied the Taser to the exposed skin of her arm and neck. The Tasing stopped as soon as Brooks was out of the car, but Brooks was obstinate to the bitter end, "resist[ing] being handcuffed by keeping her arms tense." The officers nevertheless defused the situation without causing serious harm: Brooks suffered only minor scars, her daughter was born healthy and Brooks's counsel confirmed at oral argument that the child remains healthy.

Faced with these utterly positive results, despite Brooks's stubborn effort to put herself and her unborn daughter in harm's way, the majority is reduced to counting the seconds between Tasings, finding that the "rapid succession provided no time for Brooks to recover . . . and reconsider her refusal to comply." Majority op. at 19023. Bull pucky! Although Brooks claims she was "scared" and "in shock" after the initial Tasing, she also admits that she began yelling for help and honking her car's horn. Stepping into the shoes of a reasonable officer at the scene, as we must, *see Graham*, 490 U.S. at 396-97; *Luchtel*, 623 F.3d at 980, Brooks's actions weren't those of someone dazed and befuddled, unable to think about what to do next. They bespoke a deliberate decision to continue her defiance. A single drive-stun application having already proved insufficient inducement to Brooks's compliance, the double dose was an objectively reasonable next step and was therefore entirely constitutional. *See Scott* v. *Harris*, 550 U.S. 372, 381-82 & n.8 (2007).

According to the majority, "Brooks bears *some* responsibility for the escalation of this incident." Majority op. at 19022 (emphasis added). This suggests that the rest of the blame is with the officers. Wrong, wrong, wrong. Brooks is completely, wholly, 100 percent at fault. Had she behaved responsibly, she'd have driven away in a few minutes with no complications. Instead, Brooks risked harm to herself, her unborn daughter and three police officers because she got her dander up over a traffic ticket. The officers, for their part, were endlessly patient, despite being called liars and otherwise abused by Brooks. They deserve our praise, not the opprobrium of being declared constitutional violators. The City of Seattle should award them commendations for grace under fire.

I agree, of course, with the majority that the officers are entitled to qualified immunity from Brooks's excessive force claim. But, because I believe the officers' actions were entirely reasonable, I dissent from my colleagues' decision to deny them immunity from Brooks's state law assault and battery claims. *See McKinney* v. *City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000) ("Having found . . . that the officers' use of force was reasonable, we find that they are entitled to state law qualified immunity for the assault and battery claims.").

### *Mattos* **v.** *Agarano*

I find *Mattos* considerably closer but, for the reasons stated in the panel opinion, *Mattos* v. *Agarano*, 590 F.3d 1082 (9th Cir. 2010), I believe the officers in that case acted constitutionally as well. They entered the Mattoses' home in response to a domestic violence call initiated by Jayzel herself. By the time the officers arrived, Jayzel seems to have regretted getting the police involved. However, police are trained not to leave just because the parties to a domestic dispute ask them to do so. They have to assess the situation and make sure everyone is, in fact, OK. This usually involves talking to both

parties separately, determining whether the party who called is under duress and entering the home to check on the safety of children or others inside. This is a highly intrusive procedure but one made necessary by our litigation-minded culture.

It's a difficult situation all around, and the best way to get through it is for everyone to cooperate with the police. Unfortunately, Jayzel's husband was combative with the officers, and Jayzel came to his defense instead of letting the police do their work. When Officer Aikala placed Troy under arrest, Jayzel stood in Aikala's way, asking questions and insisting that everyone go outside. It's simple common sense, as well as a civic duty, to stand aside immediately when police announce they're making an arrest. Jayzel neither exhibited common sense nor fulfilled her civic duty; she breached the covenant of cooperation by interfering with the officers' efforts to do their job.

When Aikala moved in to handcuff Troy, Jayzel did not get out of the way and allow the officer to complete the arrest. Instead, she stood her ground, eventually raising her hands and touching Aikala's chest. Aikala stepped back and asked if Jayzel was touching an officer, but she didn't answer him. Instead, she turned to Officer Agarano and again urged him to move the confrontation outside. That's when Aikala Tased her, and his fellow officers handcuffed Troy.

In hindsight, Aikala might have given Jayzel a bit more warning, but when evaluating the reasonableness of an officer's use of force, we " 'allow[ ] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.' " *Luchtel*, 623 F.3d at 982 (quoting *Graham*, 490 U.S. at 397). When, as here, police enter somebody's house in response to a domestic violence call, they become targets of fear and anger generated during the initial dispute. They're in close quarters, "at the disadvantage of being on [their] adversary's 'turf.' " *Maryland* v. *Buie*, 494 U.S. 325, 333 (1990).

Officers must maintain a defensive posture throughout their investigation, operating under the assumption that "violence may be lurking and explode with little warning." *United States* v. *Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (internal quotation marks omitted). "[M]ore officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (internal quotation marks omitted). Accounting for that enhanced risk, the officers' actions here were objectively reasonable.

\* \* \*

Judge Schroeder seems to be of the view that police may use Tasers, and presumably other types of force, only against subjects who present a threat of violence. Concurrence at 19035-36. That has never been the law. A citizen has no right to refuse to follow reasonable police orders, to tie up police resources endlessly or to interfere with an arrest by standing in the way and insisting that the police leave the scene of the crime. The Supreme Court told us that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Judge Schroeder's theory conflicts with this instruction, and also with *Forrester* v. *City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994), where we upheld a jury's finding that police didn't use excessive force when they "forcibly moved [passive protesters] by tightening [nonchakus] around their wrists," causing serious pain and lasting injuries. Judge Schroeder would also have us split with the Tenth Circuit's decision in *Mecham* v. *Frazier*, 500 F.3d 1200 (10th Cir. 2007). There, an officer told a woman to leave her car or he'd arrest her, but she refused. *Id.* at 1203. Displaying far less patience than the officers here, the policeman in *Mecham* simply pepper-sprayed her and pulled her from the car. *Id.* The Tenth Circuit held that this was objectively reasonable. *Id.* at 1205.

I'm also surprised by Judge Schroeder's chauvinistic suggestion that Brooks and Mattos were entitled to special treat-

ment because "[b]oth were women, with children nearby." Concurrence at 19035. I thought we were long past the point where special pleading on the basis of sex was an acceptable form of argument. Women can, of course, be just as uncooperative and dangerous as men, and I would be most reluctant to adopt a constitutional rule that police must treat people differently because of their sex. As for the children being nearby, that's an appeal to the heartstrings that misses the mark in both cases. Brooks's son had left the car and trundled off to school; his proximity had nothing at all to do with Brooks's bizarre behavior. And there is nothing in the record suggesting that Mattos's children were in harm's way; I don't see how their presence in the house has any bearing on the case.

In any event, I disagree with Judge Schroeder's premise that these were non-threatening situations. In the Mattoses' case, the danger was quite obvious: It came from Troy—Jayzel's out-of-control, drunken husband. He needed to be subdued at once, before he could lunge at the officers, grab a weapon or run away. By interfering, Jayzel wasted precious time—time Troy could use to attack the officers or Jayzel herself.

Brooks was sitting inside a ton of steel, angry, screaming and refusing to obey police orders. She was acting irrationally, and there was no telling what she'd do next. The officers' efforts to immobilize the car by removing the key were unsuccessful, so the key remained on the floor. Brooks might've been able to reach it, start up the car and drive away. For all the officers knew, she might also have had a spare key.

The majority claims Brooks couldn't reach the key on the floor and there's no evidence she had a spare. Majority op. at 19021 n.5. But the relevant question isn't whether there was a key within Brooks's reach; it's whether a reasonable officer could have thought there might be. *Graham*, 490 U.S. at 396-97. Many people keep spare keys in the car for emergencies. And, although Brooks's pregnancy might have made it

difficult for her to reach the floor, the police couldn't be sure what was within her grasp. The officers were entitled to take precautions for their own safety and that of others. Had they been less vigilant, Brooks might well have driven off and run over one of the children in the school zone. The officers were entirely right in refusing to take that risk. If the City awards them a commendation, as I suggest it should, I hope it carries a substantial cash bonus for safeguarding the lives and safety of innocent children.

* * *

The majority and concurrence get the law wrong, with dire consequences for police officers and those against whom they're required to use force. My colleagues cast doubt on an effective alternative to more dangerous police techniques, and the resulting uncertainty will lead to more, worse injuries. This mistake will be paid for in the blood and lives of police and members of the public.

Today's decision, though nominally a victory for the officers, is a step backward in terms of police and public safety. One can only hope the Supreme Court will take a more enlightened view.

---

SILVERMAN, Circuit Judge, with whom CLIFTON, Circuit Judge, joins, concurring in part and dissenting in part:

Like Chief Judge Kozinski, I concur in the judgment in *Brooks.* I agree with him that no constitutional violation was shown. Brooks conceded that the police had the right to remove her from the car when she repeatedly refused to step out voluntarily. There are only so many ways that a person can be extracted from a vehicle against her will, and none of them is pretty. Fists, batons, choke holds, dogs, tear gas, and chemical spray all carry their own risks to suspects and offi-

cers alike. We see plenty of cases where someone on the business end of these techniques suffers serious injuries, not to mention injuries sustained by police officers who engage in hand-to-hand combat with recalcitrant individuals. In this case, tasing was a humane way to force Brooks out of her car, causing her only fleeting pain and virtually no other harm whatsoever. Because the force employed was not excessive, there was no constitutional violation.

As for *Mattos*, I agree with the district court that there are disputed issues of material fact on whether, under the law as it existed in August 2006, Mattos's conduct justified the degree of force employed by Officer Aikala. Clearly established law then extant prohibited the officers from using disproportionate force in response to a trivial provocation. The existence of disputed facts about whether Mattos's conduct was trivial is what requires a trial. This contrasts with the *Brooks* case, in which the undisputed facts showed that the police had the right to forcibly remove Brooks from her car.

Mattos had one version of their confrontation, Officer Aikala another. She says Officer Aikala bumped into her, pressed against her chest, and that she was merely shielding her breasts. Aikala, on the other hand, claims that Mattos, despite being warned to back off, fought with him as he tried to pull her away from her husband. Although the police are entitled to use force when they reasonably believe a suspect poses a danger, it was well settled in August 2006, the time of the events in this case, that the use of force must be proportional to the gravity of the threat. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc); *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001). Indeed, the Tenth Circuit has held that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force — or a verbal command — could not exact compliance." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007). In *Casey*, the Tenth Circuit reversed the district court's grant of qualified immunity on

summary judgment because the officer's "use of a Taser immediately and without warning" violated established law as of August 25, 2003. *See id.*

If Mattos's story is credited and Aikala's is disbelieved, Officer Aikala dropped a nuclear bomb when a BB gun would have sufficed. Was Officer Aikala's tasing of Mattos a use of force disproportionate to Mattos's conduct, or did her behavior justify it? Judge Ezra, a meticulous district judge, painstakingly examined the record and determined that, because the facts were in dispute about what Mattos did or did not do, a trial was necessary to resolve that question. Judge Ezra had granted summary judgment to the officers on qualified immunity grounds with respect to *all* of Mattos's *other* claims; however, the judge determined that this *one* claim could not be resolved by motion. He was right.

*Ashcroft v. al-Kidd* instructs courts "not to define clearly established law at a high level of generality," 131 S. Ct. 2074, 2084 (2011); however, *al-Kidd* should not be read to require a DNA-match between our precedent and the cases before us. *See id.* at 2083; *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Precedent already on the books in August 2006 provided officers and courts with enough guidance to know that a taser in dart mode is not a toy and presents a level of force on par with other implements "used to subdue violent or aggressive persons." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1040 n.1 (6th Cir. 1992). Because the district court correctly found that the circumstances facing Officer Aikala are disputed, summary judgment was properly denied. I would affirm the district court and, therefore, respectfully dissent.