**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WENDY WILSON; JACK WILSON;
individually and as next of kin and
personal representatives of Ryan Wilson,
deceased,

      Plaintiffs-Appellants,

v.

CITY OF LAFAYETTE; LAFAYETTE
POLICE DEPARTMENT; LAFAYETTE
POLICE OFFICER JOHN HARRIS;
LAFAYETTE POLICE CHIEF PAUL
SCHULTZ,

      Defendants-Appellees,

and

TASER INTERNATIONAL, INC.,

      Defendant.

No. 11-1403
(D.C. Nos. 1:07-cv-01844-PAB-
KLM & 1:07-cv-02248-PAB-BNB)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **GORSUCH**, and **MATHESON**, Circuit Judges.

---

    [*] This order is not binding precedent except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

One evening in August 2006, Boulder County detectives spotted Ryan Wilson near an area known to be used for the illegal cultivation of marijuana. As they approached, Mr. Wilson admitted the plants were his. But then he took off running, leading officers on a foot chase through three-quarters of a mile of rough terrain, including over a barbed-wire fence.

The detectives called for help. Among those who responded was Officer John Harris. After hearing about the progress of the foot pursuit over his radio, Officer Harris saw Mr. Wilson running across an open field. The officer drove into the field — siren and lights blaring — trying to cut off Mr. Wilson. But Mr. Wilson didn't stop. So Officer Harris jumped out and joined the chase. In doing so, Officer Harris identified himself as a police officer and commanded Mr. Wilson to halt. Seeing Mr. Wilson reach for his right pocket and fearing a weapon might be hidden there, Officer Harris repeatedly told Mr. Wilson to get his hand away from his pocket. None of this persuaded Mr. Wilson. He ran on until he approached another fence. Only at that point did he slow down, briefly turn toward Officer Harris, and again reach for his right pocket. Mr. Wilson then may have quickly turned away, as if to run once more.

At about that moment Officer Harris fired his taser. A taser works by sending an electric current between the two probes to cause a loss of muscle control. One of the taser's two probes hit Mr. Wilson's left side; while there is some dispute where the second probe hit, some evidence suggests it may have

struck Mr. Wilson either in the neck or head. Construing the evidence most favorably to the Wilsons, we assume the second probe struck Mr. Wilson's head. Once hit by the taser, Mr. Wilson fell to the ground, immobilized. When the officers approached, they found a box cutter in the right pocket where he had been reaching, but they also quickly noticed Mr. Wilson was unresponsive. Many attempts were made to revive him but without success. It seems Mr. Wilson died of cardiac arrythmia, with the respective roles played by possible contributing causes (the taser, a pre-existing heart condition, and extreme exertion) much in dispute.

After Mr. Wilson's tragic death, his parents brought suit. Initially, they pursued various theories against various defendants. Now on appeal, however, they limit their effort to one claim against one defendant, arguing Officer Harris violated 42 U.S.C. § 1983 by using excessive force against their son in defiance of the Fourth Amendment. For its part, the district court granted summary judgment to Officer Harris, holding him entitled to qualified immunity. The Wilsons disagree with that judgment and ask us to reverse.

This court assesses the question of qualified immunity *de novo*. *Martinez v. Carr*, 479 F.3d 1292, 1294 (10th Cir. 2007). Once qualified immunity is asserted by a defendant law enforcement officer, however, the plaintiff bears the "heavy two-part burden" of showing both that (1) the defendant violated a constitutional right, and (2) the "infringed right at issue was clearly established at

the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." *Id.* at 1294-95. In this case, we cannot help but agree with the district court that the Wilsons falter on at least their second burden — they have not shown a reasonable officer in Officer Harris's shoes would have realized his actions amounted to excessive force in violation of the Fourth Amendment.

To demonstrate the infringement of a clearly established right, a plaintiff must direct this court "to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). This isn't to say a plaintiff must always identify a case on point. Sometimes even a "general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question." *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006). As the district court rightly recognized, our qualified immunity analysis involves something of a "sliding scale": "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). In all events, however, it remains necessary for the plaintiff to demonstrate that "every reasonable official would have understood that what he" did violated the law. *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2080 (2011).

Turning first to the published cases from this and other circuits and the Supreme Court, none would have clearly alerted a reasonable officer in August 2006 that the conduct at issue in this case amounted to constitutionally excessive force. To the contrary, as the Sixth Circuit held after conducting an exhaustive survey of relevant cases from across the country, "prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them . . . were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012). This class of cases undoubtedly embraces ours: Mr. Wilson was resisting arrest by fleeing from officers after they identified themselves — even if the crime of which he was suspected was not itself a violent one, he was likely to be apprehended eventually, and he hadn't harmed anyone yet.

The Wilsons and the dissent apparently disagree with the Sixth Circuit's careful and extensive analysis of existing law, but they fail to directly confront that analysis or the legion cases the court discussed in the course of arriving at its conclusion. Instead, they point to just a few favored cases that, they say, suggest the excessiveness of the force Officer Harris employed. The difficulty is that, even among these selectively picked cases, virtually all were decided *after* 2006 and so by definition cannot prove the force employed was clearly unlawful *as of*

2006. *See, e.g., Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010); *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007). *But see Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988).

Even if we were able to overlook that dispositive problem another would quickly emerge:  even on their own terms none of the principal cases on which the Wilsons and the dissent rely actually helps their cause.  Instead, the cases tend to lack at least one of two salient features present in this one:  fleeing or an investigating officer's reasonable concern that the suspect possessed something that could and might well be used as a weapon against him.  In *Cavanaugh*, for example, the court allowed a claim for excessive force but the plaintiff there hadn't attempted to evade law enforcement and quite clearly didn't possess any weapon.  625 F.3d at 665-66.  In *Casey*, we found excessive force only after the police tackled, tasered, and knocked to the ground a man peacefully attempting to return a file he had unlawfully taken from a courthouse.  There was no felony (only a misdemeanor), no fleeing, no weapon, no refusal to obey police commands.  509 F.3d at 1279-80, 1284-85.  There was no risk of flight or a potential weapon in *Orem* either.  523 F.3d at 444-45 (4th Cir. 2008).  And in *Samples*, it was disputed whether the plaintiff was fleeing and the force employed (six revolver shots) was undoubtedly deadly.  846 F.3d at 1331-33.  In our case by contrast, there is no dispute Mr. Wilson was fleeing or that his actions in

reaching for his pocket, especially after being warned not to do so, could lead a reasonable officer to worry he might have a lethal weapon and was prepared to use it. Whether the tasing in our case amounted to the use of "deadly force" subject to heightened scrutiny, moreover, the law did not say in 2006, nor do the Wilsons suggest otherwise. Given all this, we cannot say the case law the Wilsons cite, even if it predated the incident at issue, would go so far as to clearly establish a Fourth Amendment violation in this case.

Were we to slide down the scale further still, away from cases altogether and toward more general constitutional principles, we would still be unable to say Officer Harris should have known his conduct was constitutionally excessive. In assessing Fourth Amendment excessive force claims we look to the totality of the circumstances and, in doing so, three considerations are often in play: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In this case, the application of these so-called *Graham* factors and looking to the totality of the circumstances provides no more clarity to the situation.

Looking to *Graham*'s first consideration, the illegal processing and manufacturing of marijuana may not be inherently violent crimes but, outside the medical marijuana context, they were felonies under Colorado law at the time of

- 7 -

the incident. Colo. Rev. Stat. Ann. § 18-18-406(6)(a); *id.* at § 18-18-406(7.5). And Officer Harris testified, without rebuttal, that he had been trained that people who grow marijuana illegally tend to be armed and ready to use force to protect themselves and their unlawful investments.

On the second factor, no one questions that the use of a taser, especially if one probe hits the head, amounts to a significant physical intrusion requiring a correspondingly significant justification. When a probe strikes the head, "the nature and quality of the intrusion" is undoubtedly more severe than a probe that doesn't strike the head, requiring a heightened showing of "countervailing governmental interests" to justify the intrusion. *Graham*, 490 U.S. at 396 (quotation marks omitted). But the record does not show precisely how dangerous a taser is in these circumstances, though everyone seems to assume it is less lethal than a gunshot and, again, the Wilsons do not contend it amounts to deadly force. Meanwhile, the facts show that there were significant countervailing governmental interests, that Officer Harris confronted a substantial threat to his safety: he faced Mr. Wilson without fellow officers close enough to offer immediate help; Mr. Wilson disregarded repeated orders to stop; as he confronted a second obstacle to his flight, Mr. Wilson reached toward his pocket despite commands not to do so; Officer Harris could have learned the true nature of what Mr. Wilson had in his pocket only after it was drawn against him; and even box cutters, we know, can be dangerous. The situation at the time the

officer fired his taser was, thus, replete with uncertainty and a reasonable officer in his shoes could have worried he faced imminent danger from a lethal weapon. In similar circumstances this court has said that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed. . . . A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (alterations omitted) (internal quotation marks omitted). We are not at liberty to hold otherwise now.

On the third *Graham* factor, there is no question Mr. Wilson actively resisted arrest by running over three-quarters of a mile from the officers, jumping over a barbed-wire fence, and failing to stop despite repeated commands. To be sure, at the moment of confrontation Mr. Wilson approached *another* fence and hesitated. Given this, it is possible the fence would have cut short his attempt to flee. But, for all Officer Harris knew, Mr. Wilson was considering an escalation of his resistence by introducing the use of force when, faced with a second obstacle, he chose to reach for his pocket despite warnings not to do so.

Looking to the circumstances as a whole, then, the *Graham* factors prove indeterminate at best. One might argue that, on balance, they favor Officer Harris. One might, perhaps with more difficulty, argue they tip in the Wilsons' favor. But however viewed they do not *clearly* indicate Officer Harris's conduct

- 9 -

was unlawful. And to know that much is to know we must grant qualified immunity. Maybe the force Officer Harris used *was* excessive relative to the threat it turned out he faced, as the Wilsons and dissent argue. But that is not enough to warrant damages. To win damages, the Wilsons must show the force the officer used under the rapidly evolving circumstances he faced was *clearly* excessive as of 2006. And this the Wilsons fail to do: they identify no authority or general legal principle suggesting the use of the taser in this case was *clearly* excessive in light of Officer Harris's legitimate self-defense interest.

At qualified immunity's second step, *Graham* cautions us to proceed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking account of "the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." 490 U.S. at 396-97. That admonition seems as if it were intended for this deeply saddening case. With the perspective of hindsight one can easily imagine ways in which this tragedy might have been averted, and no doubt everyone wishes it had been. But the events happened as they did and they happened under highly tense, uncertain, and rapidly evolving circumstances without any *clear* direction in the law that might have warned Officer Harris his conduct was unlawful. *Id.*

Without case law to support their cause or any clear lesson to be drawn from the *Graham* factors, the Wilsons and dissent seek to make much of the fact

that Officer Harris "intentionally" or at least "recklessly" aimed the taser at Mr. Wilson's "head." *See* Dissent at 10, 12, 16. But under long settled Fourth Amendment law, our analysis may not be informed by the officer's subjective intent or motives in deploying that force. Instead, our analysis must focus (as it has) on the question whether the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. In undertaking this assessment, in asking about the objective reasonableness of the force used, we must and do view the facts from the "perspective of a reasonable officer on the scene," not from the subjective perspective of the officer involved. *Id.* at 396; *Tanberg v. Sholtis*, 401 F.3d 1151, 1168 (10th Cir. 2005) ("Under this objective standard, evidence tending to show Officer Sholtis's subjective state of mind is irrelevant."). That is the direction the Supreme Court and our precedents give us and which we must and do follow.

Neither are the inferences the Wilsons and the dissent would have us draw about the officer's state of mind only legally irrelevant: they are also not entirely obvious. Even assuming the officer did strike Mr. Wilson's head, as we do, we cannot be sure he did so "intentionally" or "recklessly." The only direct evidence we have on that score comes from Officer Harris who expressly disclaimed any such state of mind, saying that he aimed for Mr. Wilson's body, *not* his head. Of course that testimony is self-serving, but it seems to bear corroboration in other

- 11 -

facts found by the district court, including the fact the two men were running "headlong" through rough terrain as they approached the second fence; they were "about 15 feet" away from each other at the time; and events unfolded extremely rapidly as Mr. Wilson approached the second fence. *See* D.Ct. Op. at 12-13. Neither do we have any evidence about the taser's record of accuracy, let alone under such dynamic and unstable circumstances. *Cf. Forrest v. Prine*, 620 F.3d 739, 746 (7th Cir. 2010) ("No reasonable jury could believe that a police officer, although trained in the use of tasers, always hits precisely his target when the target is moving."). Given all this, we simply cannot share the dissent and Wilsons' confidence that the officer's testimony is worthy of no credence and he "'intentionally' shot Wilson in the head in the same way [he] 'intentionally' [chose] to use a taser to stop the defendant instead of tackling him." Dissent at 14.

We sympathize with the Wilsons over their terrible loss. But the Supreme Court has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except "the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), in order that officers might not be unduly "inhibit[ed] . . . in performing their official duties," *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001). Given the direction we have from the Supreme Court and this court's

precedent, and in light of the state of the law as of 2006, we cannot say the district court erred in its decision to grant qualified immunity.

Having reached that conclusion, we have no need to address Officer Harris's alternative argument for affirmance — namely, that Wendy Wilson lacked authority to pursue this case because she is not the personal representative of her son's estate. The dissent takes up the issue and suggests that *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990), bars pursuit of *any* state survival or wrongful death cause of action through § 1983. But as Ms. Wilson argues, one could read *Berry* very differently, as holding merely that *Oklahoma's* survival and wrongful death statutes shouldn't be borrowed. *See Berry,* 900 F.2d at 1504, 1506 (specifically discussing the deficiencies of *Oklahoma's* survival and wrongful death actions). Who is correct we have no need to decide in this case. Likewise, given our ruling on qualified immunity we have no need to reach the Wilsons' evidentiary appeal contesting the district court's decision to restrict the scope of their proffered causation expert's testimony at trial.

The judgment of the district court is affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge

- 13 -

11-1403, <u>Wilson, et al., v. City of Lafayette, et al.</u>

**BRISCOE**, Chief Judge, concurring in part in the result, and dissenting**:**

I respectfully concur in part, and dissent in part.  The majority fails to give sufficient weight to the fact that the taser used by Officer Harris on August 4, 2006, had a targeting function, that Officer Harris fired at Ryan Wilson from only ten to fifteen feet away, and that the training manual specifically warned officers against aiming at the head or throat unless necessary.  In light of this, I would hold the 42 U.S.C. § 1983 excessive force claim filed by Ryan Wilson's estate against Officer Harris can survive summary judgment, potentially resurrecting the other federal and state claims.  That said, I would affirm the district court's dismissal of Wendy Wilson's 42 U.S.C. § 1983 wrongful death claims and the challenged evidentiary ruling.  Accordingly, I would affirm in part, reverse in part, and remand.

**I**

Because the majority focuses solely on a single § 1983 excessive force claim against Officer Harris, I believe it helpful to set forth a more detailed procedural history in order to understand the issues raised on appeal.

Plaintiffs filed two separate suits in Colorado state court—one by Jack Wilson, Ryan Wilson's father, for himself and Ryan's estate, and one by Wendy Wilson, Ryan Wilson's mother, for herself and Ryan's estate.  The cases were removed to the United States District Court for the District of Colorado and were

consolidated. Jack Wilson asserted eight claims: (1) against Officer John Harris, wrongful death under Colorado state law; (2) against the City of Lafayette on a respondeat superior theory, wrongful death under Colorado state law; (3) against Harris and the City of Lafayette, violation of civil rights for Ryan's death under 42 U.S.C. § 1983; (4) against the City of Lafayette on a failure to train theory, violation of civil rights for Ryan's death under 42 U.S.C. § 1983; (5) against Harris and the City of Lafayette, violation of civil rights for Ryan's death under 42 U.S.C. § 1983 for civil conspiracy; (6) against Harris and the City of Lafayette, violation of civil rights for use of excessive force under 42 U.S.C. § 1983; (7) against Harris, violation of civil rights for use of excessive force and lack of probable cause under 42 U.S.C. § 1983; and (8) against Taser International, Inc., product liability under Colorado state law. Wendy Wilson asserted six claims: (1) against all defendants,[1] except Taser International, wrongful death under 42 U.S.C. § 1983; (2) against all defendants, except Taser International, deprivation of the rights of Wendy Wilson's rights to a familial relationship with the decedent under 42 U.S.C. § 1983; (3) against Harris, battery under Colorado state law; (4) against all defendants, negligence under Colorado state law; (5) against Taser International and John Does, product liability based

---

[1] Wendy Wilson initially filed suit against the City of Lafayette, the Lafayette Police Department, Harris, Police Chief Paul Schultz, TASER International, and John Does 1-5. App. A at 142.

on negligence under Colorado state law; and (6) against Taser International and John Does, product liability based on strict liability under Colorado state law.

On September 24, 2007, the City of Lafayette and the Lafayette Police Department filed a motion to dismiss Wendy Wilson's § 1983 claims against the Lafayette Police Department and her negligence claims against the city and the Lafayette Police Department. By this motion, the City of Lafayette and Lafayette Police Department sought to dismiss portions of Wendy Wilson's claims one and two that were against the police department and the portions of her claim four that were against the city and the police department. Regarding the federal claims, the city and the police department argued that the police department is not a separate and distinct legal entity amenable to suit under 42 U.S.C. § 1983. Regarding the state law claims, they argued that the Colorado Governmental Immunity Act (CGIA), Colo. Rev. Stat. § 24-10-106(1), provides sovereign immunity for public entities (including the City of Lafayette and Lafayette Police Department) regarding all tort claims, including negligence, unless such immunity is expressly waived under the statute. A magistrate judge reviewed the motion and recommended that it be granted. The district court accepted the recommendation without opposition from either party. Wendy Wilson also eventually stipulated to dismissal of her second and fourth claims as against Police Chief Schultz.

The City of Lafayette also filed a motion to dismiss Jack Wilson's second, third, and fifth claims as against the city. The City of Lafayette argued that the

- 3 -

CGIA rendered it immune from suit on Jack Wilson's second claim, and Jack Wilson agreed, voluntarily abandoning the claim against the city. The district court determined that the third claim, which Jack Wilson tried to base on an alleged due process violation, was really an excessive force claim that should have been based on the Fourth Amendment. This unnecessarily duplicated Jack Wilson's other claims, and the court dismissed the claim as against the city. Finally, the district court dismissed the fifth claim as against the city based on its determination that the complaint failed to plead with specificity the necessary components of conspiracy. Shortly after the court issued its order, Jack Wilson voluntarily dismissed those same federal due process and conspiracy claims against Officer Harris.

Plaintiffs eventually stipulated to Taser International's dismissal. Before Taser International was dismissed from the suit, however, Taser International filed a motion to exclude one of the plaintiffs' experts, Dr. Kelly C. Lear-Kaul, from testifying about the taser's role in Ryan death. The court granted the motion, determining that Dr. Lear-Kaul's report that the taser could have caused Ryan's death lacked "a specific and well-founded explanation of the manner in which a [taser] could have caused the cardiac arrhythmia." App. E at 233.

Against the other defendants, the plaintiffs had several remaining claims. Jack Wilson and the estate had four remaining claims: (1) against Harris, wrongful death under Colorado state law; (2) against the City of Lafayette on a

failure to train theory, violation of civil rights for Ryan's death under 42 U.S.C. § 1983; (3) against Harris and the City of Lafayette, violation of civil rights for use of excessive force under 42 U.S.C. § 1983; and (4) against Harris, violation of civil rights for lack of probable cause under 42 U.S.C. § 1983. Wendy Wilson had four remaining claims: (1) against the City of Lafayette, Harris, and Schultz, wrongful death under 42 U.S.C. § 1983; (2) against the City of Lafayette and Harris, deprivation of the rights of the plaintiff to a familial relationship with the decedent under 42 U.S.C. § 1983; (3) against Harris, battery under Colorado state law; and (4) against Harris, negligence under Colorado state law.

In the now appealed order, the district court dismissed all of these claims. First, the district court held Wendy Wilson could not bring a § 1983 wrongful death claim because she was not the representative of the estate. Next, it rejected Wendy Wilson's § 1983 familial relationship claim, because Wendy Wilson made no showing that the defendants intended to deprive her of her familial relationship. Moving to Jack Wilson's federal claims on behalf of the estate, the court concluded that Harris did not use excessive force in arresting Ryan Wilson, and, that even if he did, he was entitled to qualified immunity. The court then reasoned that, if the § 1983 claims against Harris failed, all of the other § 1983 claims must fail as well. The court also rejected Jack Wilson's lack-of-probable-cause claim, finding that he had abandoned the claim and that there was adequate probable cause for Ryan Wilson's arrest. Finally, the court considered the state

law claims, and determined that they would fail as well, because they relied on an assumption that Harris's actions in tasing Ryan Wilson were excessive.

On appeal, plaintiffs assert the district court erred in four ways: 1) the trial court erred in ruling that 42 U.S.C. § 1983 did not permit Wendy Wilson's wrongful death cause of action; 2) in failing to view the facts in the light most favorable to the plaintiffs, and so erroneously holding that Harris was entitled to qualified immunity; 3) in dismissing the wrongful death claims under the Colorado Wrongful Death Act; and 4) in restricting Dr. Lear-Kaul's causation testimony.

**II**

First, I address whether Wendy Wilson had a cause of action for wrongful death under 42 U.S.C. § 1983. The district court held that 42 U.S.C. § 1983 does not recognize a wrongful death action brought by a third party. I would affirm this decision. Although we do allow for the recovery of some traditional wrongful death damages in an action under 42 U.S.C. § 1983, we do so only through the § 1983 cause of action brought by the decedent's estate, and Wendy Wilson was not the representative of the estate.

In Berry v. City of Muskogee, 900 F.2d 1489 (10th Cir. 1990), we held that the remedy in a § 1983 death case "should be a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the

liability is 'to the party injured.'" Id. at 1506-07 (citing 42 U.S.C. § 1983).[2]  In

doing so, we first considered the possibility that we might instead borrow from

state law—there Oklahoma—as authorized by 42 U.S.C. § 1988.  We refused to

do so.  And our reasoning appears to have foreclosed the argument made by

Wendy Wilson that we might reach a different result when analyzing a different

state's wrongful death statute.[3]

In Berry we said:

> The difficult question we face here is
> whether damages in a § 1983 action in which
> death occurs are limited to those recoverable
> under the Oklahoma survival action alone, or to
> those recoverable by such a survival action and an
> Oklahoma wrongful death suit, or whether
> damages are determined by some federal standard
> either as a survival or wrongful death-type action
> not defined or limited by state law.

---

[2]  Wendy Wilson supports her argument by citing Cossio v. City & Cnty. of Denver, Colo., 986 F. Supp. 1340, 1344-45 (D. Colo. 1997), and Sager v. City of Woodland Park, 543 F. Supp. 282, 288 (D. Colo. 1982).  Both of these cases appeared to permit incorporation of state wrongful death statutes into § 1983 through § 1988, but our holding in Berry forecloses this option.  Sager was decided before we published Berry, and Cossio, which does not cite Berry, appears to be wrongly decided (and, in any case, was dismissed on the merits).

[3]  I note, however, that our holding now conflicts with the law in Sixth Circuit, whose earlier precedent, Jaco v. Bloechle, 739 F.2d 239 (6th Cir. 1984), we relied on in Berry.  See Frontier Ins. Co. v. Blaty, 454 F.3d 590, 603 (6th Cir. 2006) ("We believe section 1988's instruction to set aside a state remedy should only be used where it provides no meaningful deterrence, such as when that remedy provides no recovery for an otherwise valid plaintiff.  This Court should not disturb a state remedy unless it is clear that such remedy is wholly inconsistent with the Constitution and the goals of section 1983.").

900 F.2d at 1501. We first determined that limiting remedies to those available under some state survival statutes, such as Oklahoma's, would overly limit recoveries and fail to provide a sufficient deterrent for civil rights violations. Id. at 1504. In deciding whether borrowing the Oklahoma wrongful death statute was an appropriate way to cure this deficiency, we noted that "[i]n considering whether the purposes of § 1983 are satisfied by adoption of state survival and wrongful death actions, we must consider that different states will define them differently, thus requiring individual analyses of each state's law." Id. at 1506. "We might then have to find that a state's law works satisfactorily in some instances, as when there are surviving dependants, but not in other cases, as when there is no one with a right to sue." Id.

But we also said "[w]e must be careful in answering this question to avoid transgressing Moor [v. County of Alameda, 411 U.S. 693]'s prohibition of borrowing complete causes of action under the guise of vindicating rights under § 1983." Id. at 1504. Further, turning over this remedy to state law would give states control over "the scope and extent of recovery" in addition to its allocation. Id. at 1506. This meant that in some states, like in Oklahoma, recovery would be diverted to parties named in the statute "to the exclusion of decedent's creditors or the beneficiaries of the decedent's will, if he or she has one." Id. at 1506.

In light of these concerns, we decided to fashion a uniform, federal common law remedy that would incorporate some of the traditional common law

recoveries in wrongful death suits.  Id. at 1506-07.  Our opinion spoke not to the

deficiencies of a specific wrongful death statute, but rather about state statutes

more broadly.  In sum:

> we conclude[d] that supplementing *a* state survival action with
> a state wrongful death action does not satisfy the criteria of §
> 1988 for borrowing state law.  The *laws* are not suitable to
> carry out the full effects intended for § 1983 cases ending in
> death of the victim; they are deficient in some respects to
> punish the offenses.  Application of state law, at least in some
> instances, will be inconsistent with the predominance of the
> federal interest.

Id. at 1506 (emphasis added).

Tellingly, we never actually analyzed the adequacy of the Oklahoma

wrongful death statute at issue in Berry.  Wendy Wilson's contention that the

differences between the Oklahoma and Colorado wrongful death statutes would

change our conclusion is predicated on a misreading of our opinion.  We did not,

as Wilson suggests, see Aplt. Br. at 22, express concerns about the limitations

contained in *both* the Oklahoma survival and wrongful death statutes.  We noted

only the inadequacies of the Oklahoma survival statute.  Indeed, we went on to

state that the Oklahoma wrongful death statute "duplicate[d], in many respects,

the recovery Mark Berry might have obtained had he lived to sue for his injuries"

in addition to "permit[ting] recovery of the loss of consortium and grief of the

surviving spouse, children, and parents, which Mark Berry could not have

recovered had he had lived."  900 F.2d at 1506.  We never stated we found the

Oklahoma wrongful death statute, as opposed to wrongful death statutes in other

- 9 -

states, insufficient to accomplish the goals of § 1983. Thus, the fact that Colorado's wrongful death statute may differ from the Oklahoma wrongful death statute at issue in Berry does not compel a contrary conclusion, and the district court correctly dismissed Wendy Wilson's § 1983 claims brought on her own behalf against Officer Harris, Police Chief Schultz, and the City of Lafayette.

## III

Next, I address Jack Wilson's excessive force claims on behalf of Ryan Wilson's estate. As stated above, I believe the majority failed to give proper weight to, as alleged, the egregious circumstances of this case. On this basis, I would reverse the district court's decision to grant summary judgment for the defendants.

"This court reviews the grant of summary judgment de novo, applying the same standards as the district court." Salazar v. Butterball, LLC, 644 F.3d 1130, 1136 (10th Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and a dispute "of fact is material if under the substantive law it is essential to the proper disposition of the claim." Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003) (quotations omitted).

Plaintiffs argue that the district court erred in determining that Harris used only justifiable force to seize Wilson. This issue arose based on Harris's assertion of qualified immunity. When a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of showing (1) the defendant's violation of a constitutional right; and (2) that the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." Martinez v. Carr, 479 F.3d 1292, 1294-95 (10th Cir. 2007) (quotation omitted). But "[e]ven though the plaintiff bears the burden of making this two-part showing [that defendant is not entitled to qualified immunity], we construe the facts in the light most favorable to the plaintiff as the nonmoving party." Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012) (quotation omitted).

*a. The Facts*

While the district court generally viewed the facts in the light most favorable to the plaintiffs, the district court appears to have erred with respect to Harris's intent when tasing Ryan Wilson. The plaintiffs maintain that Harris either intentionally or recklessly shot Ryan Wilson in the back of the head with the taser. Although Harris argues he aimed for the "center mass," the taser is equipped with a laser targeting system and he fired from just ten to fifteen feet away. Regardless of Harris's offered explanations as to why his action was not

- 11 -

reckless, we must at summary judgement view the facts in the light most favorable to the Wilsons. Under this factual scenario, a jury could reasonably infer that Harris intentionally or recklessly shot Ryan Wilson in the head with the taser.

*b. As Alleged, Harris Shooting Wilson in Head with Taser Constituted Unconstitutional Use of Excessive Force*

Although not necessary to its opinion, the majority expresses skepticism that Harris's use of the taser would even reach the level of a constitutional violation. It reached this conclusion after analyzing the *defendant's* conduct under Graham v. Connor, 490 U.S. 386 (1989). But the factors the majority analyzes are not exclusive. Graham requires looking at all circumstances, including the nature of the alleged Fourth Amendment intrusion. Id. at 396. The majority's analysis gives scant attention to the, as alleged, egregious conduct of Officer Harris—a intentional or reckless shot to the head with a taser with a targeting function and from merely ten to fifteen feet away.

As the majority points out, Graham "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. And it is true, that at best, these factors are mixed. Harris knew that Ryan Wilson was suspected of illegally growing marijuana, and we have held

- 12 -

that similar felony crimes are severe crimes.  Smith v. Wampler, 108 F. App'x 560, 565 (10th Cir. 2004) (unpublished) (noting that drug possession and distribution constitute severe criminal activity).  In addition, Wilson was attempting to evade arrest by flight.  These factors both favor Harris.

But taking the facts in the best light for the plaintiffs, it is not clear Harris could have reasonably believed that Ryan Wilson posed an immediate danger to himself or to the other officers.  There appears to be significant dispute as to what actually happened prior to the time Harris fired.  At worst, Harris believed that Ryan was carrying a knife small enough to fit in his pocket.  But Harris admitted he never saw the knife leave Ryan Wilson's pocket.  And Ryan Wilson, based on the alleged location of the taser shots, was turned or turning away from Harris at the time Harris fired the taser.

Further, even if those factors favor Harris, the ultimate question is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397 (quotations omitted).  When analyzing these cases, we undertake a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396 (quotations omitted).  The majority gives little attention to the nature of the force used.  In Cavanaugh v. Woods Cross City, we noted that a taser "sends up to 50,000 volts of electricity

- 13 -

through a person's body, causing temporary paralysis and excruciating pain," making the "nature and quality of the intrusion into the interests of [the person] protected by the Fourth Amendment . . . quite severe." 625 F.3d 661, 665 (10th Cir. 2010) (quotations omitted). Even if Ryan Wilson's conduct here was more culpable than in the taser cases cited by the majority, an intentional or reckless taser shot *to the head* seems to merit an even higher burden for a government actor to justify his use of force.

In the present case, it would be unreasonable for an officer to fire a taser probe at Ryan Wilson's head when he could have just as easily fired the probe into his back. The taser training materials note that officers should not aim at the head or throat unless the situation dictates a higher level of injury risk.[4] Nothing about the situation here required an elevated level of force. All Harris was attempting to do was subdue a fleeing suspect.

Likewise, we have held that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir. 2007) (citing Hinton v. City of Elwood, 997 F.2d 774, 776-77, 781 (10th Cir. 1993) (holding it was not excessive force for officers

---

[4] Specifically, the manual warns: "DO NOT AIM AT HEAD/THROAT UNLESS SITUATION DICTATES A HIGHER LEVEL OF INJURY RISK IS JUSTIFIED. Hits in these areas are effective, but probes in the eyes and throat can cause serious injuries." App. D at 397.

to use an "electrical stun gun" on a man, who after shoving an officer, was wrestled to the ground and then proceeded to kick and bite officers)). Extending this logic, it is excessive to use a taser shot to the head when there is no reason to believe that a taser shot to the body would not exact compliance. Because there is no evidence that tasing Ryan Wilson in the body would not have sufficed, tasing him in the head, if intentional or reckless, was an unreasonable use of force in affecting the arrest. Thus, viewing the evidence in the light most favorable to the plaintiffs, Harris violated Ryan Wilson's Fourth Amendment right to be free from an unreasonable seizure.

The majority mischaracterizes my argument when it suggests that considering Harris's intent to hit Ryan Wilson in the head impermissibly looks at subjective intent as part of the Graham analysis. Graham's requirement that courts should view excessive force claims "without regard to their underlying intent or motivation" clearly aims to prohibit the use of a good or bad faith analysis. Graham, 409 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constituional."). To say Harris "intentionally" shot Ryan Wilson in the head is not to say he acted in bad faith, but rather to say he chose to aim for Ryan Wilson's head, just as an officer "intentionally" chooses to use a taser to stop the defendant instead of tackling him. An objective, totality of the circumstances

- 15 -

analysis requires us to consider that this is a different "nature of force" used than in the taser cases cited by the majority.

Further, it is not readily apparent why, assuming this discussion of intent is barred by Graham, our analysis would not need to consider the plaintiffs' allegation that Ryan Wilson was shot in the head. If anything, a discussion of intent only helps Harris, as there may be, as the majority points out, mitigating factors making his allegedly inaccurate shot reasonable. That is, if the court cannot consider Harris's excuses in its objective inquiry, it must, at the summary judgment stage, accept the allegation the taser hit Ryan Wilson in the head—a more excessive use of force than seen in our other taser cases—and analyze accordingly. If not, it follows from the majority's reasoning that it matters only *what* weapon an officer uses and not *how* he uses it. I am not sure how to square that with a totality of the circumstances analysis, if it can be squared at all.

In addition, the defendants' citation to the unpublished Fifth Circuit case of Batiste v. Theriot, 458 F. App'x 351 (5th Cir. 2012) is inapposite. The Fifth Circuit there held there was no excessive use of force despite a taser shot to the head. But the autopsy determined the victim died, hours after being tased, as a result of "multidrug intoxication" and "neither the medical expert who performed the autopsy, nor [plaintiffs'] own expert, testified that [his] injuries were the direct result of the tasing." Id. at 353, 355. The court concluded "[t]he injury did not result from the tasing regardless of its reasonableness," meaning the tasing

could not serve as the basis of an excessive force claim. Id. at 355. Here, Ryan Wilson died shortly after being tased, and the tasing remains a possible cause of death. Further, Batiste did not discuss the distance at which the taser was fired, the taser's targeting system, or whether the training manual warned against shots to the head. It is thus unpersuasive.

### c. This Right was "Clearly Established"

Identifying a constitutional violation, of course, does not end our inquiry. In order to hold an officer liable, the plaintiff must also show the law was clearly established. This right appears to be clearly established such that Harris had no legitimate justification for intentionally or recklessly shooting Ryan Wilson in the head. As alleged, Officer Harris's conduct was sufficiently egregious that the lack of perfectly analogous taser cases at the time of Ryan Wilson's death should not shield Harris from suit.

"We cannot find qualified immunity wherever we have a new fact pattern." Casey, 509 F.3d at 1284. The Supreme Court has "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006) (quotation omitted). "[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though [such conduct] has not previously been held

unlawful." Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006) (quotation and alteration omitted).

"The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004). If a jury were to conclude that Harris intentionally or recklessly shot Ryan Wilson in the head with the taser, his conduct would be egregious. And, as we have said, "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did." Casey, 509 F.3d at 1286 (quotation omitted). See also Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196 (10th Cir. 2001) ("It is also clearly established that police use of less than deadly force in seizing and detaining a person, particularly a bystander not suspected of wrongdoing, must be justified under all of the circumstances."). True, Ryan Wilson was a fleeing suspect, not an innocent bystander. But, as stated above, aiming at or recklessly hitting Ryan Wilson's head was not justified under the circumstances. And a reasonable officer would know that aiming or recklessly tasing Ryan Wilson in the head under the circumstances presented was unconstitutional.

The majority makes much of the fact that the plaintiffs failed to cite a taser case decided prior to 2006 that holds this particular use of a taser constitutes

- 18 -

excessive force. But we did not cite to any case holding the use of a taser excessive when we denied qualified immunity to one of the defendants in Casey; the best we could say was that no circuit had *upheld* the use of a taser in those circumstances. Casey, 509 F.3d at 1286. The violation of Graham, along with an absence of "legitimate justification" for the officer's actions, was enough for the plaintiff to survive the defendant's assertion of qualified immunity. Id. ("On the summary judgment record—which of course may be disputed at trial—Officer Lor's use of the [t]aser was without any legitimate justification in light of Graham."). Given the egregious nature of Officer Harris's action and lack of a reasonable or legitimate justification for using excessive force, I similarly do not believe the absence of a perfectly analogous taser case dooms Jack Wilson's § 1983 claim on behalf of the estate in this case. Thus, I would hold that the district court erred by granting Harris qualified immunity.

*d. Claims Against Other Defendants*

Because the district court granted Harris qualified immunity, the district court also rejected Jack Wilson's related § 1983 claims for the estate against the City of Lafayette. Because I would reverse with respect to Harris's qualified immunity, I would also reverse with respect to these claims. Although the City of Lafayette offers additional arguments as to why it should be granted summary judgment, the district court has yet to address these arguments. Where an issue has been raised before the district court, but not ruled on, we generally favor

- 19 -

remand for the district court to examine the issue in the first instance. See Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); In re R. Eric Peterson Constr. Co., 951 F.2d 1175, 1182 (10th Cir. 1991) ("The district court never reached this issue . . . . We therefore remand this issue to the district court."). Given the fact-intensive nature of this inquiry and the lack of briefing on these issues from the plaintiffs, I would remand these issues to the district court.

Similarly, I would remand the state law claims under the Colorado wrongful death statute to the district court. The court based its grant of summary judgment on these claims on its conclusion that Officer Harris's actions were objectively reasonable. As I disagree, it would create the possibility of reviving these claims. I would also leave for the district court to address in the first instance the defendants' other arguments in response to the state law claims.

**IV**

Because I would not dismiss the case on summary judgment, I would proceed to consider the evidentiary issue raised by the plaintiffs. They challenge the district court's decision to limit the testimony of Dr. Kelly C. Lear-Kaul on the issue of causation. "We review de novo the question of whether the district court employed the proper legal standard and performed its gatekeeper role in admitting expert testimony but review for abuse of discretion the court's actual

application of this standard in deciding whether to admit or exclude an expert's testimony." United States v. Abdush-Shakur, 465 F.3d 458, 466 (10th Cir. 2006) (quotation omitted). "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968 (10th Cir. 2001) (quotations omitted).

The plaintiffs have failed to establish that the district court abused its discretion as regards this evidentiary ruling. Simply because another district court would not abuse its discretion by admitting this testimony does not mean a district court abuses its discretion by excluding it. See, e.g., N. Am. Speciality Ins. Co. v. Britt Paulk Ins. Agency, Inc., 579 F.3d 1106, 1112 (10th Cir. 2009) ("[T]hat the district court [in one case] did not abuse its discretion by allowing expert testimony by an insurance industry expert does not lend measurable support to the contrary position that the district court in this case abused its discretion by refusing to permit similar testimony."). Although I would likely have admitted the testimony if I were ruling from the trial bench, the plaintiffs must under the abuse of discretion standard show that the district court's decision "exceeded the bounds of the rationally available choices given the facts and the applicable law in the case at hand." Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't, 533 F.3d 1183, 1186 (10th Cir. 2008). The arguments made by the plaintiffs cannot meet this burden. Thus, I would affirm the district court's

decision to limit Dr. Lear-Kaul's testimony.  To the extent the plaintiffs worried the doctor's inability to testify as to causation might mislead the jury, the plaintiffs would have the option of not offering her testimony at all.

**V**

Accordingly, I would affirm in part, reverse in part, and remand.

11-1403, *Wilson, et al., v. City of Lafayette, et al.*

**MATHESON**, J., concurring

Construing the evidence in the light most favorable to the Wilsons, Officer Harris was 10 to 15 feet away from Ryan Wilson when he tasered him in the head. Despite the countervailing circumstances – including Ryan Wilson's felony conduct, fleeing arrest and ignoring law enforcement commands, and reaching for his pocket – the *Graham* factors point to excessive force, as Chief Judge Briscoe concludes.

The clearly established law element of qualified immunity, however, is closer for me. Because the Wilsons bear the burden of proving that element, *Lynch v. Barnett,* 2013 WL 49713, at *3 (10th Cir. 2013), I concur in the result reached by Judge Gorsuch in affirming Officer Harris's qualified immunity. I add a few comments on the clearly established law issue.

Courts have found a constitutional violation can be clearly established by showing (1) "that a materially similar case has already been decided, giving notice to the police;" (2) that "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary;" or (3) "that a broader, clearly established principle," such as the *Graham* factors, "should control the novel facts in this situation." *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010).

First, a clearly established constitutional violation exists if there is a Supreme Court or Tenth Circuit decision on point or the clear weight of authority from other courts establishes the law as the plaintiffs contend. *Schwartz v. Booker,* 702 F.3d 573, 587 (10th Cir. 2012) (quotations omitted). No such case law is available here.

Second, if the officer's conduct was "obviously egregious," a clearly established constitutional violation may exist even if there are no cases specifically on point. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *see also Keating*, 598 F.3d at 766; *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) (noting that the "constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that this conduct cannot be lawful").

The case law does not define egregiousness. Examples of police conduct that courts have labeled as egregious are arguably more severe than what is at issue here: a forensic chemist's fabrication of evidence against an innocent defendant, *Pierce*, 359 F.3d at 1279; an officer's use of pepper spray on a handcuffed woman who was neither resisting nor disobeying commands, *Vinyard*, 411 F.3d at 1340; and officers' deliberate false statements to health care officials that a detainee had been violent in an effort to have the person involuntarily committed, *Meyer v. Bd. of Cnty. Com'rs*, 482 F.3d 1232 (10th Cir. 2007).

Officer Harris's conduct in this case – tasing a resisting, fleeing, and potentially threatening felony suspect in the head in violation of safety protocol – while excessive, does not seem to reach the level of egregiousness of the foregoing examples.

Third, a violation may be clearly established based on general constitutional principles. *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006) ("[A] general constitutional rule that has already been established can "apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful."). Courts have found police conduct to violate clearly established law absent case law on point and without labeling the behavior egregious if the *Graham* factors tilt so clearly in favor of the plaintiff that any reasonable officer would have been on notice that the force used was unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also, e.g., Keating*, 598 F.3d at 766; *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008). In other words, if the *Graham* analysis is decidedly in favor of the Wilsons, the violation can be clearly established.

As Judge Gorsuch explains, the law must be clearly established at the time of the incident. But if a court relies on general constitutional principles to determine whether the law was clearly established – and here the general principles come from *Graham* – it may consult cases analyzing the general

- 3 -

principles at issue in factually similar circumstances to inform the clearly established analysis irrespective of when those cases were decided.  *See, e.g.*, *Keating*, 598 F.3d at 766, 767 (considering a 2005 case to illustrate a clearly established constitutional principle allegedly violated in 2003).  In addition, cases published after the incident can establish that the law was *not* clearly established at the time of the incident.  *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1200 (10th Cir. 2009).

Following this approach, other circuits have reached different conclusions in roughly similar cases.  The Eighth and Fourth Circuits have recently found excessive taser use to violate clearly established law.  In *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), the court found a clearly established violation when an officer tased an automobile passenger suspected of violating open container laws during a traffic stop.  The plaintiff disobeyed commands to end a call to 911, but there was a dispute whether officers reasonably perceived a threat.  *Id.* at 498.  Similarly, in *Orem v. Rephann*, the court found a clearly established violation under *Graham* when an officer repeatedly tasered a suspect who was resisting arrest and verbally insulting officers, even though she had been physically restrained and was therefore not a threat.  523 F.3d at 446-47.[1]

---

[1]    In considering cases involving taser use, courts have focused not only on whether a taser was used, but how it was used.  For example, compare the foregoing with cases finding no excessive force, in which courts have emphasized

(continued...)

On the other hand, the Ninth Circuit, sitting en banc, recently found excessive taser use to be a constitutional violation but held that the violation was not clearly established. In *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc), one plaintiff was repeatedly tased while behaving erratically during a traffic stop, *id.* at 437, and another plaintiff was tased when she interfered with the arrest of her husband after a domestic dispute, *id.* at 439. Both plaintiffs resisted police commands but did not use or threaten force. The court found that the officers at most could have believed they posed a *potential* threat. In both cases, the court found a constitutional violation. *Id.* at 445-46, 451-52. However, the court also concluded that the violations were not clearly established because the *Graham* analysis was not sufficiently obvious to put the officers on notice that their conduct was unlawful. *Id.* at 448, 452.

The level of force in the present case was greater than that applied in the two cases in *Mattos*, which did not involve taser shots to the head, but the seriousness of Mr. Wilson's suspected crime was also greater than that of the crime in *Mattos*. The taser shot to the head in this case constituted more force than a single taser shock. In this way, it may be considered analogous to the repeated taser use in *Orem*. However, the risk at the time Officer Harris fired his

_____

[1](...continued)
that the taser use included only a single shock. *E.g.*, *McKenny v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2010) (single taser shock not excessive); *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (same).

taser was also greater than the risk faced by the officer in *Orem*; the *Orem* suspect was physically restrained, while Mr. Wilson was actively resisting arrest, fleeing, and reaching for his pocket.

In short, although I believe the *Graham* analysis establishes a constitutional violation in this case, whether it is so one-sided as to make the violation clearly established absent case law on point is less clear. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("An officer might . . . have a mistaken understanding as to whether a particular amount of force is legal . . . . If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense.").

Inasmuch as the plaintiff bears the burden on the clearly established element, I vote to affirm the district court on this issue.